(93 Misc. Rep. 368)

### PATTEN v. HARPER'S WEEKLY CORP. et al.

(Supreme Court, Trial Term, New York County. January, 1916.)

1. PLEADING ⊗⊃194(5)—ANSWER—DEFENSE BAD IN PART.

A separate defense, which contains denials of material allegations of the complaint, will withstand a demurrer, though bad in itself.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 452; Dec. Dig. ⊗⊃194(5).]

2. LIBEL AND SLANDER ⊗⊃91, 100(1)—ACTIONS—PLEADING—ISSUES.

Even if a mere denial of innuendoes in a complaint for libel be proper, such a denial is surplusage, where the publication of the libel is itself denied, and unnecessary innuendoes, or such as attribute to words their natural and obvious import, are not put in issue by a denial.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 215–217, 246, 247; Dec. Dig. ⊗⊃91, 100(1).]

3. LIBEL AND SLANDER ⊗⊃94(4)—ACTIONS—PLEADING—ANSWER.

A denial of plaintiff's good repute is no defense to an action for libel.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 222–224; Dec. Dig. ⊗⊃94(4).]

4. LIBEL AND SLANDER ⊗⊃94(4)—ACTIONS—PLEADING—ANSWER.

Where a libel consists of a charge of fraud and deceit in the manufacture and sale of a worthless or harmful medicine, a plea of justification must allege that plaintiff knew his product was worthless and harmful, and that it was sold with intent to deceive.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 222–224; Dec. Dig. ⊗⊃94(4).]

5. EVIDENCE ⊗⊃54—PRESUMPTIONS—PRIMARY FACTS.

Where the law does not presume a certain fact from certain other facts, it is necessary, in order to raise such presumption, that the fact to be presumed is necessarily implied therefrom, and it is not sufficient that it may be inferable from the primary facts.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 74; Dec. Dig. ⊗⊃54.]

---

⊗⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. LIBEL AND SLANDER ☞94(4)—ACTIONS—PLEADING—ANSWER.

Where an alleged libel is an attack on the advertised and actual merits of a patent medicine and upon plaintiff as one actually and morally responsible for the injurious effects from the sale of the medicine, and the nefarious methods by which sales are effected, a plea of justification, which fails to allege that the plaintiff manufactured or sold the medicine, and which merely alleges that he was the chief owner of the medicine company, and which does not show that plaintiff was connected with, or responsible for, the making, selling, or advertising, except as it may be inferred from his being the chief owner, is insufficient.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 222–224; Dec. Dig. ☞94(4).]

7. LIBEL AND SLANDER ☞94(1)—ACTIONS—PLEADING—ANSWER.

Where a justification is pleaded as a complete defense to the whole publication charged in an action for libel, the plea should be as broad as the charge, and the very charge attempted to be justified.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 219; Dec. Dig. ☞94(1).]

8. LIBEL AND SLANDER ☞94(4)—JUSTIFICATION—TRUTH OF CHARGE.

Where the libelous charge alleged is that the patent medicine sold by plaintiff is a cheat because of its working "inevitably" to the hurt of the victim, and that plaintiff, who manufactures and sells it is a swindler, a plea of justification that the medicine is without therapeutic value, save "in special cases and under special circumstances," is insufficient, not being as broad as the charge.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 222–224; Dec. Dig. ☞94(4).]

9. LIBEL AND SLANDER ☞36, 41—OFFENSES—"PRIVILEGE."

A publication by a newspaper, relating to the manufacture and sale of a patent medicine and the conduct of the manufacturer and seller, is neither privileged nor qualifiedly so; "privilege" being a defense to what might otherwise be libelous.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 114, 115, 127–129; Dec. Dig. ☞36, 41.]

10. LIBEL AND SLANDER ☞48(1)—JUSTIFICATION—"FAIR COMMENT."

The right of "fair comment" extends equally to newspapers and to the public generally, but is limited to comment on the facts; mere belief of the truth of the matter published being insufficient.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 144, 147; Dec. Dig. ☞48(1).]

11. LIBEL AND SLANDER ☞48(1)—JUSTIFICATION—FAIR COMMENT.

In a publication purporting to disclose the worthless character of a medicine manufactured and sold by a company, of which plaintiff was the chief owner, and to expose the falsity of the assertions of the curative value of the medicine, charges that plaintiff is a swindler and fraud and a health poisoner, and statements comparing him with a "cadet" and a "panderer," and asserting that by methods characteristic of such creatures he has become rich and influential, are, as matter of law, not comment.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 144, 147; Dec. Dig. ☞48(1).]

Action by John A. Patten against the Harper's Weekly Corporation and others. Demurrer to answer sustained.

The action is for libel. Defendants Harper's Weekly Corporation and Hapgood answered jointly and defendant McClure's separately. Plaintiff demurs to several affirmative defenses set up in these answers as insufficient.

The complaint alleges that Harper's Weekly and McClure's (corporations)

are publishers of the periodical Harper's Weekly, of which Hapgood is editor and manager. Plaintiff was part owner of the Chattanooga Medicine Company, manufacturer and vendor of "Wine of Cardui," and was also prominent in the affairs of the Methodist Episcopal Church as a lay member, holding positions of responsibility and influence. The libelous matter as set forth is as follows:

"Women, not men, are the financial prop of the patent medicine swindle. By nature more credulous and fearful, and brought into intimate contact with ailment and suffering by their physical organization, they lend themselves with pathetic eagerness to the fraudulent schemes of the health poisoners. 'Female weakness' are magic words that rarely fail to tap a golden stream, and it is among those who prey on the terrors of the mother sex that the great fortunes are found.

"The 'cadet,' quite properly, is held in loathing. In most statute books it is written down as a crime to live on the wages of a woman's shame. Yet wherein does the 'cadet' differ materially from the patent medicine frauds who live on the wages of a woman's fears? Both sources of revenue are equally parasitic. Scientific analysis has failed to reveal a single so-called 'woman's remedy' that, in its essence, is not a cheat, working inevitably to the hurt of the victim. While the 'cadet' is put in prison, the 'female weakness' panderer, after winning riches, mounts to high place in civic and religious organizations, and becomes a pillar of society.

"The two principal 'suffering women' businesses in the country to-day are Wine of Cardui * * *

"The chief owner of the Chattanooga Medicine Company, maker of Wine of Cardui, is John A. Patten. Mr. Patten is one of the richest and most influential citizens of Chattanooga. Even more, he is probably the most influential layman in the Methodist Episcopal Church, being chairman of the book committee, which has general supervision of the publishing financial interests of the church; also power to fix the salaries of bishops, church publication editors and publishing agents, and to remove from office the editor of any of the official publications. In addition, he is one of the managers of the board of education, a member of the commission on federation, of the executive committee of the laymen's associations and of the Methodist Men's Convention. * * * "

By innuendo the meaning attributed to these words is, in substance, that plaintiff was a "swindler" "engaged in fraudulent schemes," a "health poisoner," a "fraud," "living on the wages of women's fears," a "panderer" of a class with "male bawds," by all of which means and practices plaintiff had achieved prominence in civic and religious associations; that by the sale of Wine of Cardui, a poisonous decoction, to sickly and credulous women plaintiff had amassed a fortune and had achieved high position in social and religious life, and also that by the sale of said compound plaintiff had placed himself on the level of a "cadet" (whose trade is defined by the pleader to be both reprehensible and criminal), and as such should not only "be loathed by all mankind," but deserved, and should receive, the punishment accorded to such persons.

Further libelous matter alleged is: "Furthermore, no official publication of the Methodist Episcopal Church accepts the advertisements of Wine of Cardui. If Mr. Patten's money is 'clean' and not derived from a vicious fraud on sickly women, what is the matter with his advertising?" The meaning attributed by innuendo to these words is that the Methodist Church refused to permit the advertisements of Wine of Cardui to appear in its official publications because those in control thereof knew or believed that as a medicine it was harmful and a fraud, and that because of his connection therewith plaintiff was a "swindler," and no better than a "cadet," and that the money he had obtained from the sale of Wine of Cardui had been obtained by fraud and was "unclean." Then follows a general innuendo, in which the preceding separate innuendoes are summed up in somewhat different words, but in effect and meaning substantially the same as that theretofore attributed to them.

First Defense—Justification: (II) Denies plaintiff's good repute; admits publication of an article of which the matter set forth in the complaint is a part, but the true meaning thereof appears only from the article itself, of which a copy is annexed; said article "is true in substance and in fact"; denies the innuendoes of the complaint. (III) Plaintiff was "chief owner" of the medicine company, maker of Wine of Cardui; a rich and influential citizen of Chattanooga, and an influential layman in the Methodist Church, chairman of the committee having supervision of the "publishing financial interests of the church," with power to fix salaries of and to control editors, publishing agents, and others, and also held other offices of importance. (IV) The medicine company had widely advertised that Wine of Cardui "was needed by women as a general nerve and system tonic," a remedy for all "female ills," nonintoxicating, harmless, and of medicinal value to women for certain purposes and during certain periods, which the pleader details, whereas, in fact, "it was without therapeutic value, save   *   *   *   in special cases and under special circumstances, because of its alcoholic contents," and if used by all women under all circumstances, it was worthless, a fraud, and in some cases "harmful and poisonous to the system." (V) Wine of Cardui was "essentially twenty per cent. alcohol, other drugs present being" insufficient for medicinal effect. (VI) Prior to the publication of the article, no "official publication" of the Methodist Church "accepted" advertisements of Wine of Cardui, and because of the "circumstances hereinbefore disclosed," it was proper to inquire "what was the matter with the plaintiff's [sic] advertising if his money was clean and not derived from a vicious fraud on sickly women? The answer may be found in the character of the advertising" issued by the medicine company prior to the publication of the article, "random" extracts from which are set forth at length. (VII) It is true that "women and not men are the financial prop of the patent medicine swindle. By nature more credulous, etc., continuing to quote from the words set forth in the complaint down to and including the words "it is among those who prey on the terrors of the mother sex that the great fortunes are found." It is true that the "cadet" is held in loathing. "In most statute books it is written down as a crime to live on the wages of a woman's shame. Yet it may properly and truthfully be inquired wherein does the 'cadet' differ materially from the patent medicine frauds who live on the wages of a woman's fears?" The pleader then marshals alleged facts in support of the asserted analogy between "cadets" and "patent medicine frauds," concluding with the words: "It is true that one of the principal 'suffering women' businesses in the country to-day is 'Wine of Cardui.' "

Second Defense—Privilege and Fair Comment: (VIII) Realleges the allegations of paragraph II of the first defense. (IX) Defendants were publishers of Harper's Weekly, and "sought to publish" facts only which they believed to be true, with fair comments thereon, in pursuance of their "moral duty [sic]" to their readers and to the public. (X) Defendants believed there were "on the market" for sale widely advertised "nostrums," some worthless and others harmful, and that they would be serving the public interest by exposing the same. (XI) Animated by these motives they engaged one Creel to investigate. They knew Creel to be an experienced "investigator" and journalist "of recognized standing." They directed Creel to consult one Adams, who had investigated patent medicines, and whom defendants believed to be a "competent investigator." (XII) Creel consulted Adams, who said Wine of Cardui "was a fraud, a cheat, a swindle"; was sold on advertisements which were "false, vicious and indecent," and that in his (Adams') opinion "the public interests would be served by the publication of the true facts concerning the medical value of Wine of Cardui." (XIII) Creel also "interviewed" Dr. Kebler, "in charge of the bureau of chemistry" of the department of agriculture, by whom he was told that the chief ingredient of Wine of Cardui was alcohol, its other ingredients being "in such proportion" as to lack therapeutic value; that the "claims" made for Wine of Cardui by the medicine company were "false and outrageous," and that the preparation, if used by girls and women indiscriminately, as urged by the advertisements, was worthless and harmful. (XIV, XV, XVI) Creel also corresponded with the American

Medical Association, an organization of high repute, the chemists of which "had made a scientific investigation" of Wine of Cardui. (XVII) The association gave Creel the "results" of its investigation of Wine of Cardui as set forth in articles published by it, a copy of which is annexed. (XVIII) Creel studied these articles, compared them with the information received from Adams and Kebler, and believed the statements in the association publication to be true. (XIX, XX) Relying on the foregoing information, Creel wrote the article in question, and submitted it to Hapgood, together with the information on which it was founded. Because of their confidence in Adams and Kebler and the publications of the medical association, defendants believed their article, as well as those of the association's, to be true; and (XXI) that Wine of Cardui was 20 per cent. alcohol and its other ingredients without therapeutic value. (XXII) Prior to the publication of said article defendants knew that the medicine company had widely advertised Wine of Cardui, as shown by extracts from such advertisements. (Here follow the same "extracts" as are set forth in paragraph VI of the defense of justification.) (XXIII) Defendants believed the "claims" made for Wine of Cardui in these advertisements were untrue, fraudulent, indecent, and calculated to deceive and prey upon the hopes and fears of women (evidently referring to the text of the advertisements thereinbefore set forth); that alcohol, taken indiscriminately by women of all ages and without medical advice, was harmful and in some cases "poisonous to health"; that "he is a 'health poisoner' who urges mothers to give freely to 12-year old girls a 'remedy' containing 20 per cent. alcohol and devoid of any other medicinal value." (XXIV) "Wherefore" defendants, because of their aforesaid "knowledge," and believing the "facts" thereinbefore set forth to be true, published the article in question, but without malice, and in the interest of the public and of the readers of Harper's Weekly. (XXV) In view of the said advertisements defendants believed the excerpts from their article set forth in the complaint (although separated from their context) were fair comments "on the facts hereinbefore set forth" and believed by defendants to be true. (XXVI) They believed plaintiff was connected with the Methodist Church, as set forth both in their article and in the complaint, such belief being founded on the publications of the American Medical Association. (XXVII) They believed no official publication of the Methodist Church accepted advertisements of Wine of Cardui, the grounds of their belief being the same as last stated. (XXVIII) They believed "every statement" contained in the article of which plaintiff complains was true, and that "the comments upon the facts set forth in said publication were fair," and that the deductions therefrom and illustrations and analogies contained in the article were "fair and reasonably included within the discharge of the moral duty" they owed to their readers and to the public, and that the occasion for said article was proper; and (XXIX) was privileged.

Martin W. Littleton, of New York City, for plaintiff.

Emory R. Buckner, of New York City, for defendants Harper's Weekly and Hapgood.

Duell, Warfield & Duell, of New York City, for defendant McClure Publications.

HOTCHKISS, J. Instead of the concise statement of facts required by traditional rules of pleading, the phrasing of the several defenses follows so closely the literary style of the "investigator" who wrote the article complained of as to encourage the suspicion that the latter also drafted the defenses demurred to. The diffuse, rhetorical, argumentative, and repetitious form of the pleading, which includes also many mere items of evidence as distinguished from ultimate facts, has materially added to the labor of analyzing the defenses under ex-

amination. Stripped to their bare bones, the first and second defenses amount to this:

First Defense: Denies that plaintiff's reputation was good; denies publication of the words alleged (save as part of the entire article) and the innuendoes attached thereto; alleges that in view of the true nature of Wine of Cardui and the character of the advertisements promoting the sale thereof by the medicine company (the maker and vender), the published article was in substance true, and the words concerning plaintiff contained therein were justified.

Second Defense: Repeats the allegations of paragraph II of the answer, and alleges, further, that because of matters disclosed in detail defendants believed the statements contained in the article were true, and that the reflections upon plaintiff were fair comments "on the facts hereinbefore set forth"; also that the occasion was privileged.

[1] Although a separate defense may in itself, be bad, if it contains denials of material allegations of the complaint, according to the practice in this department, the defense is good against demurrer so long as the denials remain, even though they be improperly included in the defense. Black v. Gibbs, Greenbaum, J., 158 N. Y. Supp. 69.

[2] Although the defense of justification is ordinarily one of confession and avoidance, from the papers herein it appears that on a motion made by plaintiff to strike out, the court, as to both the first and second defenses, held that defendants were entitled to deny publication of excerpts from an article, and "to justify a charge as interpreted by an article in its entirety." As to the innuendoes, it was held in effect that where defendants justified an article in its entirety, of which article the libelous words complained of were a part, it was proper, in the plea of justification, to deny the innuendoes of the complaint. The sufficiency of the defenses was, of course, not involved on said motion. Admitting that a mere denial of innuendoes be proper, and that such a denial simpliciter is sufficient to raise an issue, a denial of innuendoes is clearly surplusage where, as here, the publication of the alleged libel is itself denied. So, too, unnecessarily innuendoes, or such as attribute to words their natural and obvious import, are not put in issue by a denial. Morrison v. Smith, 177 N. Y. 366, 69 N. E. 725; Haffen v. Tribune Ass'n, 126 App. Div. 675, 111 N. Y. Supp. 225. This, I think, is the situation here, for the libelous words alleged in the complaint obviously import the meaning attributed to them by the pleader.

[3] It is also apparent that the denial of plaintiff's good repute is no defense. I am thus brought to consider the first and second defenses in the light of their affirmative allegations, and as well in the light of the entire article, as distinguished from the excerpts set forth in the complaint. The allegation that the article "is true in substance and in fact" raises no issue. See post.

[4] Where the libel consists of a charge of fraud and deceit in the manufacture and sale of a worthless or harmful medicine, I think it is necessary for a plea of justification to allege that plaintiff knew his product was worthless and harmful, and that it was sold with intent

to deceive. The essence of the wrong lies in knowledge of the material facts and the evil intent involved in the act of selling. Whenever knowledge and intent are material they should be alleged either expressly or impliedly.

[5] Given certain facts, the law itself in some cases presumes the existence of certain other facts. But where the law raises no such presumption, then, whether the situation is one of pleading or of proof, to presume a fact it is not sufficient that the fact to be presumed may be inferable from the primary facts; it must be such as is necessarily implied therefrom. See Jacobs v. Monaton Realty & Inv. Co., post.

In the case of one who manufactures, as distinguished from one who sells (see Hehmeyer v. Harper's Weekly Corp'n, 156 N. Y. Supp. 98), there may be a presumption of knowledge of ingredients, but it would be going altogether too far to say that it is necessarily to be presumed that the manufacturer of a patent medicine, not necessarily poisonous, knows that his composition is harmful, and, if he sells it, that his sales are fraudulent, and made with intent to deceive.

There is no express allegation of knowledge or intent in this answer, and no fact is alleged from which either knowledge or intent must necessarily be implied. So far from this being the case, the first defense expressly admits that "in special cases and under special circumstances" Wine of Cardui has therapeutic value.

[6] The plea is deficient for a further reason. As a whole, the article in question is an attack upon the advertised and actual merits of Wine of Cardui, and upon plaintiff as one actually and morally responsible for the injurious effects resulting from the sale of the substance and, as well, the nefarious methods by which sales are effected. In fact plaintiff is not alleged to have manufactured or sold Wine of Cardui. The allegation is that plaintiff was "chief owner" of the medicine company, the "maker" and "manufacturer" of Wine of Cardui. Every act alleged with respect to the manufacturing, advertising, and sale of Wine of Cardui, if directly alleged at all, is alleged to have been the act of the company. Whether the "company" was a partnership or a corporation does not appear. Nowhere is plaintiff alleged to have been in any way connected with or responsible for the making, vending, or advertising, save so far as responsibility therefor may be inferred from the fact that he was "chief owner" of the "company." The pleader has apparently assumed that because plaintiff was such "chief owner," it necessarily followed that he was responsible for all of the "company's" acts, chargeable with their falsity and wrongfulness and, as well, with knowledge of the alleged worthless character of Wine of Cardui and with intent to deceive by the sale thereof. The whole fabric of the defense is based upon this assumption, the infirmity of which is apparent. See Jacobs v. Monaton Realty & Inv. Corp., 212 N. Y. 48, 105 N. E. 968. Manifestly the defense is bad.

[7] There is still a further objection to the defense in question. Inasmuch as justification is pleaded as a complete defense to the whole of the publication, the plea should be as broad as the charge, and the

very charge attempted to be justified. Fero v. Ruscoe, 4 N. Y. 162; Sawyer v. Bennett, 20 N. Y. Supp. 835.[1]

[8] In effect the charge is that Wine of Cardui is a "cheat" because of its "working inevitably to the hurt of the victim" who uses it, and, inasmuch as plaintiff manufactures and sells the substance, plaintiff is a swindler, etc. The plea, however, alleges not that the use of Wine of Cardui works "inevitably" to the detriment of the user, but that "it is without therapeutic value save  *  *  *  in special cases and under special circumstances," and if used by all women under all circumstances it is "harmful and poisonous to the system." Clearly this does not meet the charge.

[9, 10] I think the defense of privilege and fair comment is also bad. The occasion was neither privileged nor qualifiedly so. It is the right of every man to state facts, and as well to fairly comment on the wares of those who appeal to the public to buy, and also to comment upon their conduct in that behalf. This latter is but a phase of the right of fair comment generally (Newell, Sland. & Lib. [3d Ed.] § 702) which has often been confused with privilege. But, as Mr. Odgers says:

"A privilege is a right which I possess because I am I; because I hold a particular office or stand in a particular position or confidential relation to some one else. A right which every citizen possesses merely because he is a citizen  *  *  *  is no privilege at all." An Outline of the Law of Libel, 42.

Privilege is a defense to what might otherwise be libelous; fair comment is not libel at all. The publishers of newspapers stand in no better position with respect to the exposure of frauds or to the right of comment than do other individuals, and any pretense on their part of a "moral duty" in defense of what would not, under the same circumstances, be lawful for any person is mere cant. When criticism of conduct, of a book, or of a commodity is invited by the occasion, it must be confined to the action, work, or thing. If it goes beyond this, and especially if it attacks the author or individual, the critic writes at the peril of being held for libel. Whether the bounds of fair comment have, in the particular instance, been exceeded is usually a question for the jury, but it is too much to say that it is always such. Triggs v. Sun P. & P. Ass'n, 179 N. Y. 144, 154, 71 N. E. 739, 66 L. R. A. 612, 103 Am. St. Rep. 841, 1 Ann. Cas. 326; Press Pub. Co. v. Gillette, 229 Fed. 108, —— C. C. A. ——.

[11] For similar reasons, and particularly where the facts are uncontradicted, it may be a question of law whether particular words are, in any sense, comment, fair or unfair. If A. complains that B. published him as a murderer, would it be a defense for B. to answer that A. advertised pure milk for sick babies, but in fact sold impure milk, wherefore B. denounced him as a murderer. The sense in which the word "murderer" was used might be open to question, but any such defense would be raised by denying the charge or the innuendo. If false, the charge would obviously be defamation, not comment. If the charge were true as laid, it would be open to the defense of jus-

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 66 Hun, 626.

tification, but if asserted to be comment, its appropriateness as such should be dealt with as a question of law. Applying these principles to this case, we find that under the guise of an article purporting to disclose the worthless character of a so-called medicine, manufactured and sold by a "company," of which plaintiff was the "chief owner," and also purporting to expose the falsity of the assertions of the curative value of the medicine made by the "company" in its advertising (but with the affairs of which "company" plaintiff is not alleged to have been connected otherwise than as such "owner"), defendants have, in substance called plaintiff a swindler, a fraud, and a health poisoner, have held him up to odium by comparing him with a "cadet" and a "panderer," and have asserted that by methods characteristic of such creatures he has become rich and influential. In respect of the defense I am now discussing, and aside from the objection that the plaintiff is not alleged to have taken part in the business of advertising and vending Wine of Cardui or to have had knowledge of its alleged fraudulent nature, save as "chief owner," the defendants' words concerning plaintiff can, in no sense, be deemed comment, and it should be so determined as matter of law.

There is a further objection to the defense in question. Based on the allegations of paragraph II of the answer, which contains an immaterial denial of plaintiff's good repute and of the innuendoes of the complaint, and upon an allegation that the article complained of "is true in substance and in fact," followed by further allegations to the effect that defendants had used due care to ascertain the truth of the numerous facts constituting the substance of the article complained of, all of which facts they believed to be true, it is asserted that defendants' charges against plaintiff and their reflections upon his character were no more than fair comment. The bare denial that the article was "true in substance and in fact" is worthless. Bingham v. Gaynor, 203 N. Y. 27, 96 N. E. 84. But it lies at the foundation of the defense of fair comment that the facts commented on are true, and mere belief in their truth is insufficient. Fry v. Bennett, 5 Sanford, 54; Bingham v. Gaynor, supra, 203 N. Y. 33, 96 N. E. 84; Triggs v. Sun P. & P. Ass'n, supra, 179 N. Y. 154, 71 N. E. 739, 66 L. R. A. 612, 103 Am. St. Rep. 841, 1 Ann. Cas. 326.

The plaintiff also attacks the several defenses on grounds other than those I have discussed, some of which are of obvious seriousness; but, as the objections referred to are now known to defendants, and as there must be an amendment, opportunity will then be afforded to avoid these objections, should such a course be deemed wise, and a discussion of them now is unnecessary.

The defenses contained in the answers of defendant McClure's are, in substance, the same as those of Harper's and Hapgood, and must fail for the reasons I have given.

· Demurrer sustained, with costs of trial.