SAMUEL SHENKMAN, Respondent, *v.* WALTER F. O'MALLEY, Appellant.

First Department, November 27, 1956.

568

J. *Howard Carter* of counsel (*James W. Rodgers* and *Andrew L. Hughes* with him on the brief; *Townley, Updike, Carter & Rodgers,* attorneys), for appellant.

*Boris Marcus* of counsel (*Benjamin Schenkman* with him on the brief; *Marcus & Schenkman,* attorneys), for respondent.

BREITEL, J. In this action for slander, on motion, three complete defenses and two partial defenses, interposed in the amended answer, have been attacked on the ground of legal insufficiency. Defendant appeals, and urges reinstatement of each of the defenses.

It is concluded that the partial defenses are legally sufficient and should be sustained, for they tend to negate malice and are, therefore, admissible in mitigation of damages; that the second complete defense is sufficient; but that neither the first nor the third complete defense is sufficient and they were properly stricken. Defendant, however, should be permitted to replead the first complete defense, since there is a possible defense based on the "rolled up plea" of truth and fair comment.

Plaintiff is a physician, and defendant is the president of the professional baseball team, best known as the Brooklyn Dodgers. One of the team's starring players, Roy Campanella, suffered a hand injury, which gravely interfered with his playing. An operation was performed by one Dr. Fett to remove a bone chip. Some months later, plaintiff physician recommended and performed a second operation affecting a nerve in the hand. He submitted a bill for his professional services to Mr. Campanella and, later, to defendant O'Malley's corporation in the sum of $9,500. The bill was not paid. Plaintiff physician sued to recover his fee, and through his lawyer, by filing the suit papers and contemporaneous statements, obtained wide publicity, the purport of which was that neither Mr. Campanella nor the Brooklyn Dodgers was paying for an operation which had rehabilitated Mr. Campanella's playing capacity.

The statements of plaintiff Shenkman, through his lawyer, upon which defendant O'Malley relies in asserting his defenses are contained in two newspaper accounts attached as exhibits to the amended answer. The first read as follows:

'' I sent the $9,500 bill to Mr. Campanella and it was promptly returned with the suggestion that the Brooklyn Dodgers Baseball Club was responsible for the bill.

'' Then I sent it to the club, and they immediately sent it back, informing me that Campanella alone was responsible for payment.

'' Between Campanella and the club, I have been paid nothing.''

Earlier in the newspaper account plaintiff Shenkman was quoted as having said that Mr. Campanella had '' refused to pay one cent ''. In another newspaper the quoted statement read as follows:

'' After it was over, Campy expressed his deep gratitude and told Dr. Shenkman to send the bill to the Brooklyn Ball Club.

'' He sent the bill there and then the Dodger front office said it wasn't their baby. They disclaimed any responsibility for it. And though Roy was grateful at first, he has apparently forgotten his obligation.''

The second newspaper account also contained the general statement that: '' A neuro-surgeon charged today that the Dodgers baseball management has run out on the bill for the operation which brought Roy Campanella's left hand and big bat back into the lineup this year.'' Whether these statements are defamatory is not before the court. For the purposes of

the second complete defense it will be assumed, as it is alleged by defendant O'Malley, that such statements are defamatory.

Upon release of plaintiff's publicity, defendant O'Malley issued a statement to the press — the subject of this slander action. The statement, as set forth in the answer,* reads as follows: "I am shocked at the self-serving story appearing in evening papers in support of Dr. Shenkman's exorbitant claim of $9,500 for what will probably prove to be an unnecessary second operation on Roy Campanella's hand. The medical profession appreciates that the original operation was successfully performed by a recognized specialist, Dr. Herbert Fett. Dr. Shenkman telephoned me in February and was most anxious to settle his claim, and admitted that he had not fixed a price or advised Roy that he contemplated such a charge. It appears that he thought he was operating on Roy's bankroll. I told him his charge was unconscionable and suggested he sue. He offered to arbitrate before a committee of doctors. I told him I preferred a jury of people who pay doctor's bills not send them. It took Dr. Shenkman a long time to get up courage to sue."

It will be observed immediately that the statement contains, among others, the following significant representations. The first is that the physician's claimed fee is exorbitant. The second is that the second operation was probably unnecessary. The third is that, by way of opinion, the medical profession believes that the first operation had been successful. The fourth is that plaintiff physician thought he was operating on the patient's bankroll, rather than on his hand.

The questions involved are raised by three complete defenses and two partial defenses. The first complete defense is the "rolled up plea" of truth and fair comment. The second complete defense is the qualified privilege of reply to a defamatory attack. The third complete defense is the qualified privilege of protection of business interests in response to attack. The first partial defense, in effect, asserts that defendant O'Malley relied on the opinions of the medical profession in making the statement involved in the action in replying to the attack upon him and his professional baseball organization. The second partial defense is of similar purport and is based upon the provocation caused by the publicity instigated in connection with the lawsuit commenced by plaintiff physician to recover his professional fee.

It is beyond dispute that the subject matter of defendant O'Malley's statement (and assumed, but not decided, for the

---

* The complaint alleges a similar, but truncated, version.

purpose of considering the pleaded defenses, to be defamatory) is in the area of the public interest and, hence, subject to fair comment. The Brooklyn Dodgers and its players receive persistent national publicity and, on occasion, world-wide attention. Medical treatment of such players, especially in reference to their capacity to play, is likewise a matter of general comment and interest. This aspect of the defenses, therefore, requires no further discussion.

In a civil defamation action, truth of the attributed statement is a complete and absolute defense. When the attributed statements, however, are not true, and the plaintiff has been defamed thereby, nevertheless, a privilege, absolute or qualified, may obtain, provided, certain preconditions dictated by public policy are fulfilled. (Restatement, Torts, § 582 *et seq.*; Prosser on Torts [2d ed.], § 95.) Thus, if with respect to a matter of public interest, one expresses a defamatory opinion, based upon facts truly stated, there is, in the absence of malice, a complete defense. (*Bingham* v. *Gaynor,* 203 N. Y. 27.) The policy is to permit, within reasonable limits, free and intelligent discussion of matters in the public interest. Such discussion could not be effected, if reasonably drawn inferences resulted in liability, merely because they should prove to be wrong. (*Foley* v. *Press Pub. Co.,* 226 App. Div. 535, 548.) But the privilege of fair comment applies only when the facts are truly stated. (*Supra,* p. 544.) It has never been applied to an opinion expressed and based upon the opinions of others, which may or may not be true. (*Skinner* v. *Powers,* 1 Wend. 451; *Patten* v. *Harper's Weekly Corp.,* 93 Misc. 368; *Stafford* v. *Stafford,* 165 App. Div. 26; cf. *Cassidy* v. *Gannett Co.,* 173 Misc. 634, 640.)

In the first complete defense, defendant O'Malley does not allege that his comment was based upon facts truly stated. On the contrary, the so-called " facts ", upon which he relies, are the opinions of physicians that the first hand-operation was " successful " and the opinion of the medical profession that such operation was successfully performed by a recognized specialist. It is not made clear that the successfulness of the first operation means any more than successful removal of a bone fragment from the hand of the patient, as distinguished from being successful in accomplishing the ultimate objective of restoring the full use of the hand to the patient. Moreover, it is not even clear from the allegations that the " success " of the first operation signifies that no further operation was required or was desirable. In any event, even these " facts " are not asserted as objectively true, but simply as the opinion

of experts. This falls short of the basis for fair comment. (Gatley on Libel & Slander [4th ed.], p. 346 *et seq.*)

It is true, that upon a trial, the nature and the successfulness of the first operation would be proven, undoubtedly, by opinion testimony, namely, through the lips and the opinion of experts. Nevertheless, it would be incumbent upon the jury, after being properly charged, to find the objective facts as distinguished from the opinions of the experts. (*Clemons* v. *Mellon*, 27 App. Div. 349.\*) As defendant has pleaded, it would suffice if the jury were to find merely that defendant relied on the extra-judicially expressed opinions of experts, regardless of whether those opinions were, in fact, right or wrong.

No considerations of public policy make it desirable that persons be privileged to base fair comment upon the opinions of others, however truly reported. Such a policy would justify endless repetition of defamatory matter, no matter how false, simply because the defamatory matter, or its supporting basis, was the product of widespread — even expert — opinion or prejudice. Consequently, the first complete defense is insufficient. Defendant, however, should be permitted to replead in the event he wishes to rely on establishing that, in fact, the first operation was completely successful, in the sense of dispensing with the need of any further operation. If so, a jury might find legally sufficient support for the comment of defendant O'Malley that plaintiff physician consciously engaged in an unnecessary operation for the purpose of obtaining an unjustified professional fee. Of course, if the comment does not convey as much, it is not slanderous in the absence of special damage alleged, and there is no office for the defense. (*Gurtler* v. *Union Parts Mfg. Co.*, 285 App. Div. 643.)

While the opinion matter contained in the first complete defense does not support the qualified privilege of fair comment, it does support the first and second partial defenses of reasonable reliance and provocation which go to mitigation of damages. If defendant O'Malley sincerely relied upon the opinions of reputable physicians, then it certainly is material to the degree of malice with which he acted. It would tend to negate malice, and a jury should consider such reliance in mitigation of damages, should plaintiff otherwise sustain his complaint. (*Crane*

---

\* This libel case involved opinion testimony to the effect that defendant's daughter could not have been blinded by the administration of belladonna by plaintiff physician. While the court reversed a judgment for defendant, after trial, it did so, only because the opinion testimony was uncontradicted. The ultimate fact to be proved was, nevertheless, that belladonna could not cause blindness, not the state of medical opinion thereon.

v. *New York World Tel. Corp.*, 308 N. Y. 470; *O'Connor* v. *Field*, 266 App. Div. 121.)

The second complete defense relates to reply to defamatory attack. This defense is available to one who has been defamed in the first instance, and who, in response to the attack, responds in kind. It has been questioned whether it is necessary that the first attacking statement be defamatory. (Seelman on Libel & Slander, § 256.) It would seem that the better rule and the sounder policy is that it should. (As a matter of fact, defendant O'Malley in his amended answer evidently assumes this to be the rule because, several times, he alleges that the initial attack was defamatory.) The occasion of a nondefamatory attack should not excuse false diatribe in reply. That in its nature would be excessive response. A crude analogy may be drawn from the law of assault where mere words, no matter how provocative, may not justify a battery in response. This defense of reply is material, of course, only where the response in kind is defamatory. The injury, if any, to plaintiff is excused, because it is the plaintiff who started the altercation. The rule was clearly stated by this court, many years ago: "The important question is whether the defendant had the right to impugn the motives of its assailant, if it did so honestly without malice and for the sole purpose of repelling the assault upon it, and not with the view of injuring the plaintiff. One who makes a public attack upon another subjects his own motives to discussion. It is a contradiction in terms to say that the one attacked is privileged only to speak the truth and not to make a counterattack, or that legitimate self-defense consists only in a denial of the charge or a statement of what is claimed to be the truth respecting its subject-matter. One in self-defense is not confined to parrying the thrusts of his assailant. Of course, the counterattack must not be unrelated to the charge, but surely the motives of the one making it are pertinent. The plaintiff selected the forum for the dispute and in that forum it would certainly tend to repel, or minimize the harmful tendency of the charges to show that the one making them was actuated by an improper motive." (*Collier* v. *Postum Cereal Co.*, 150 App. Div. 169, 178.)

The qualified privilege of reply as a defense to an action for defamation had no substantial recognition in New York before 1910 (Seelman on Libel & Slander, p. 249). Where the defense has been allowed, the defamatory nature of the reply bore a pertinency to the content, and was reasonably proportionate to the magnitude of the defamation, in the first attack. Thus, in the *Collier* case (*supra*) plaintiff had charged defend-

ant with conducting a deliberately false advertising campaign in relation to its food product. To this the defendant replied plaintiff had prostituted truth in its magazine columns to force advertisers, including the defendant, to purchase space in the magazine. Similarly, in *Preston* v. *Hobbs* (161 App. Div. 363) the initial attack was that defendant's associate had, on the threat of withdrawal of its advertising, bridled the press to suppress unfavorable publicity. The reply was that the plaintiff lied and was a muckraker, with indictments pending against him. In *Fowler* v. *New York Herald Co.* (184 App. Div. 608) plaintiff had charged that the defendant sponsored an imposter. Defendant thereupon stated that plaintiff, as a result of his physical condition, was incompetent. In *Siegel* v. *Metropolitan Life Ins. Co.* (263 App. Div. 299) plaintiff had charged, in a series of radio broadcasts, that defendant insurance company was milking its policyholders. Thereupon defendant, in a circular letter to its agents, stated that plaintiff was a former agent who had been fired for irregularities in his accounts.

The privilege of reply in other jurisdictions has been even more limited than in New York (33 Am. Jur., Libel & Slander, §§ 134–135; Newell on Slander & Libel [4th ed.], § 429; but see Gatley on Libel & Slander [4th ed.], p. 265 [English rule on reply to a demand]). The reason for the limitations on this qualified privilege has been well stated: "The law does not allow independent wrongs, of the nature treated of in this work, to be set off against each other and a balance found in favor of the less culpable party. The principle which allows proof of provocation in mitigation of damages is the same as that which is applicable in the case of a provoked assault; and if there has been time and opportunity for hot blood to cool and calm reason to resume its ordinary control, a mere provocation not connected with the wrong cannot be shown. If in this respect there is any distinction between the cases of personal encounter and assault and written defamation, it would seem that the rule should be applied with at least as great strictness in the latter class as in the former, since the composition and publication of a libel in general involves necessarily some degree of deliberation and opportunity for reflection. There are plain reasons of public policy for this limitation of the right to reply in extenuation of such wrongs, upon remote provoking inducements not connected with the matter in issue. If the law were less strict there would be less self-restraint from acts of violence and wrong calculated to disturb the peace of society. Men would be too ready to take it upon themselves to avenge their

personal grievances; and again, in the trial of causes for alleged wrongs, the principal issue would be embarrassed and confused, if not overwhelmed, by numerous collateral issues." (Newell on Slander & Libel, p. 457.) (See, also, *Turner* v. *Metro-Goldwyn-Mayer Pictures* [1950] 1 All. E. R. 449, 470–471.)

In New York, and elsewhere, the courts have not been slow to strike a defense of reply when the defamation therein was grossly disproportionate to the original charge — or was not pertinent or revelant thereto. (*Guenther* v. *Ridgway Co.*, 187 App. Div. 593, 596; *Zierler* v. *Held*, N. Y. L. J., June 29, 1944, p. 2480, col. 5; *Reynolds* v. *Pegler*, 223 F. 2d 429, cert. denied 350 U. S. 846; *Conroy* v. *Fall River Herald News Pub. Co.*, 306 Mass. 488. See cases collected in Gatley on Libel & Slander [4th ed.], p. 272.)

When one examines the allegations of the second complete defense of reply in this case, it cannot be said, as a matter of law, that the counterattack was not pertinent to the initial attack. The initial attack related to the nonpayment for medical services rendered. The counterattack, in effect, charged that the services were unnecessary and that the physician believed he was operating on the patient's bankroll, rather than on his hand. Excessiveness of reply aside for the moment, one need not pay for services that are the result of quackery and malpractice. (Of course, once again, if defendant O'Malley's counterattacking statement does not convey as much, in the absence of special damages alleged, it is not slanderous, and there is no office for the defense of reply. [*Gurtler* v. *Union Parts Mfg. Co.*, 285 App. Div. 643, *supra.*]) The other test, which the qualified privilege of reply must withstand, is that of excessiveness. Not every counterattack, if defamatory, will be excused, merely because it is in response to defamation. There must be some reasonable proportion between attack and counterattack. Once again, one may draw a crude analogy from the law of assault. If a man, with equal physique, attacks another with his fists it may not justify the use of a firearm in response. But it cannot be said on the pleading alone, as in the law of assault, that defendant O'Malley's response was excessive. That will remain a proper question for the jury to determine, as it views and makes its findings with respect to all the relevant facts and circumstances presented to it, in accordance with the rules of law upon which it will be charged.

As noted earlier, the defamatory reply to attack, if it is to be privileged, must, among other things, be a reply to a defamatory attack, not merely to any critical, adverse, unpleasant, or even grossly irritating comment. Of course, the effect of prov-

ocation is not ignored by the law but is comprehended under partial defenses in mitigation of damages.

Hence, the second complete defense is sufficient, since there remains to be resolved a question of fact whether the reply to the initial attack was excessive or not, provided, of course, it is found that the initial attack was, as alleged in the amended answer, defamatory.

The third complete defense has been denominated by the defendant as the qualified privilege to protect one's own interest. In support of this privilege he cites: *Lovell Co.* v. *Houghton* (116 N. Y. 520); *Siegel* v. *Metropolitan Life Ins. Co.* (263 App. Div. 299, *supra*); *Tierney* v. *Ruppert* (150 App. Div. 863); *Bowsky* v. *Cimiotti Unhairing Co.* (72 App. Div. 172). The *Lovell* case and the *Bowsky* case may be treated together. They stand for no more than the proposition that a person obtaining a copyright or a patent has a qualified privilege to assert that plaintiff is about to infringe the copyright or patent. The *Tierney* case involved a situation where the holder of a chattel mortgage posted a notice of sale, although, in fact, the mortgagor was not in default. This is based on the privilege in a person, having an interest in property, to make some general publication which he believes true, without malicious motive, "provided such publication is necessary and proper in the protection of defendant's interest." (*Tierney* v. *Ruppert, supra,* p. 865.) It is apparent that these three cases relate to narrow privileges available to defendants having particular relationships to specific property. They are entirely inapposite to the situation of the defendant in this case.

The final case, cited as authority by the defendant for the existence of a qualified privilege to protect one's own interest, is the *Siegel* case. In the *Siegel* case, however, the communication was between the defendant insurance company and its agents. In short, the *Siegel* case involved a communication between persons having a common interest or duty with respect to the same subject matter, namely, the business of the Metropolitan Life Insurance Co. This is the subject of an entirely different qualified privilege. (See *Hamilton* v. *Eno,* 81 N. Y. 116; *Ashcroft* v. *Hammond,* 197 N. Y. 488.)

There just is no general qualified privilege to issue generally a defamatory statement, as distinguished from a reply to defamatory attack, merely because it may serve to "protect a business interest." Not to be confused is the making of a privileged statement to others who share a common interest or duty in the same property, business or relationship, e.g., employer and employees, stockholders and corporation, member and associ-

ation. (See, Prosser on Torts [2d ed.], § 95, pp. 614–615, 618–619.) Nor should there be such a privilege.

Always to be kept in mind, in considering a defense of privilege, whether qualified or absolute, is that the defendant seeks exculpation for falsely detracting from the plaintiff's reputation to a degree that is slanderous, or, in the appropriate case, libelous. If defendant's assertion is true, there is no need for a defense, and there is no need for a privilege. To say that any protection of a business interest, subjected to criticism, should excuse calumny is foreign to our thinking. Of course, the law of defamation has spelled out privileges to excuse false attack. But the privileges arise only when a supervening public policy dictates the necessity for nonmalicious communication in well-defined relationships, where greater harm would be done if persons were permitted to speak only at the peril of complete accuracy. A business interest may be so all-embracive — and proportionately larger as the business is greater — that the amount of harm that could be done, without remedy, would be incalculable. Indeed, the larger the business the greater would be the scope of immunity from liability for injury. The purposes of the law of defamation would not be served by so untrammeled a privilege as that suggested in the third complete defense.

Hence, the third complete defense is legally insufficient.

Accordingly, the order at Special Term should be modified by reinstatement of the second complete defense and of the first partial defense, together with reinstatement of such of the allegations, with the exception of paragraph "5" thereof, contained in the first complete defense as are necessary to the statement of the first and second partial defenses, with leave to defendant to replead the first complete defense of truth and fair comment, and the order of the Special Term is otherwise affirmed. In view of the irregular procedure followed in bringing on appeals from each of the two orders at Special Term, there should be no costs allowed to either party as against the other. Settle order.

PECK, P. J., COX, FRANK and BERGAN, JJ., concur.

Order granting plaintiff's motion to strike certain affirmative defenses and paragraphs in the amended answer, unanimously modified in accordance with the opinion herein and, as so modified, affirmed. Settle order on notice.