37 F.3d 1541
 63 USLW 2292, 22 Media L. Rep. 2353
 Vincent P. FORETICH; Doris Foretich, Plaintiffs-Appellees,
v.
CAPITAL CITIES/ABC, INC.; American Broadcasting Companies,
Incorporated; ABC Holding Company, Incorporated;
The Landsburg Company; Alan Landsburg;
Linda Otto, Defendants-Appellants.
 No. 94-1050.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 12, 1994.
Decided Oct. 17, 1994.
 
 ARGUED: William Bradford Reynolds, Sr., Dickstein, Shapiro & Morin, Washington, DC, for appellants. MacKenzie Canter, III, Copilevitz & Canter, Washington, DC, for appellees. ON BRIEF: Paul R. Taskier, Adam Proujansky, Dickstein, Shapiro & Morin, Washington, DC, for appellants. Mark J. Diskin, Copilevitz & Canter, Washington, DC, for appellees.
 Before MURNAGHAN, Circuit Judge, and BUTZNER and PHILLIPS, Senior Circuit Judges.
 Affirmed and remanded by published opinion. Judge MURNAGHAN wrote the opinion, in which Senior Judge BUTZNER and Senior Judge PHILLIPS joined.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 Vincent and Doris Foretich filed a defamation action against the producers and broadcasters of an ABC docudrama in which a character apparently referred to one or both of them as "abusers" of their granddaughter, Hilary A. Foretich, who had been the subject of a prolonged and highly publicized child-custody dispute. On the defendants' pretrial motion, the district court ruled that Vincent and Doris Foretich were "private individuals," not "limited-purpose public figures," and therefore would not have to prove at trial that the defendants acted with "actual malice." The issue of the Foretiches' proper status--"private individuals" or "limited-purpose public figures"--is now before us on interlocutory appeal. Although we conclude that the Hilary Foretich custody battle became a "public controversy," we hold that neither of her paternal grandparents was a "public figure" for the purpose of comment on that controversy because their public statements and actions were made predominantly in self-defense. We therefore affirm the district court's ruling and remand the case for further proceedings.
 
 
 2
 * A
 
 
 3
 Hilary Foretich's parents, Dr. Elizabeth Morgan and Dr. Eric A. Foretich, were separated by the time she was born. By the time she learned to walk, the parents were divorced and embroiled in what would become one of the most notorious child-custody battles in American history.
 
 
 4
 In 1983, the Superior Court of the District of Columbia awarded temporary custody of Hilary to her mother, Dr. Morgan, subject to scheduled visitations by the child's father, Dr. Foretich. See Morgan v. Foretich, No. D684-83 (D.C.Super.Ct.1983). Over the next few years, Dr. Morgan allegedly came to believe that Hilary was being sexually abused during visitations with her father and the paternal grandparents, Vincent and Doris Foretich. Dr. Morgan sought a temporary suspension of the visitations, but the D.C. Superior Court denied her request. See Morgan v. Foretich, 564 A.2d 1, 2 (D.C.1989).
 
 
 5
 Following one of Hilary's visitations with the Foretiches in February 1986, Dr. Morgan refused to permit any further visits. A flurry of motions and hearings ensued, and in July 1986 Dr. Morgan was held in contempt and briefly incarcerated. See id. She still refused to turn the child over to her alleged abusers and, following another series of motions, hearings, contempt orders, and appeals, Dr. Morgan was again jailed for contempt in February 1987. Supervised weekend visitations then resumed for several months in compliance with the court's orders, while motions for emergency stays filed by Dr. Morgan, and by Hilary's guardian ad litem, were denied. See Morgan v. Foretich, 546 A.2d 407, 409-10 (D.C.1988), cert. denied, 488 U.S. 1007, 109 S.Ct. 790, 102 L.Ed.2d 781 (1989).
 
 
 6
 Also in 1986, Dr. Morgan and Hilary brought civil actions in the United States District Court for the Eastern District of Virginia, Alexandria Division, seeking damages and an end to Dr. Foretich's visitation rights. The plaintiffs claimed that Hilary had been physically and sexually abused by Eric, Vincent, and Doris Foretich, and that the Foretiches had threatened to kill or injure Hilary if she told anyone about the abuse. Specifically, the complaint accused the girl's grandfather, Vincent Foretich, of (1) manipulating Hilary's genitalia; (2) inserting various foreign objects into her vagina; (3) orally sodomizing her; (4) anally sodomizing her; and (5) masturbating himself and ejaculating into her face and hair. The complaint accused Doris Foretich of "various acts of sexual abuse and assault and battery upon her granddaughter, specifically including but not limited to acts in which she inserted objects into her vagina." Complaint, Morgan v. Foretich, C.A. No. 86-0944-A (E.D.Va.1986). The defendants filed counterclaims alleging defamation. In February 1987, following a four-day trial in which Hilary's parents and paternal grandparents testified, the jury returned a verdict against Dr. Morgan on the abuse claims and against the Foretiches on the defamation claims. Both sides appealed, and we reversed and remanded in part, see Morgan v. Foretich, 846 F.2d 941 (4th Cir.1988), but the case was never retried.[1] None of the Foretiches was ever indicted for, much less convicted of, any criminal act of child abuse.
 
 
 7
 In the meantime, Dr. Morgan hid Hilary. A District of Columbia Superior Court Judge ordered Dr. Morgan to disclose Hilary's whereabouts. She refused. Her third incarceration for civil contempt began in August 1987 and continued for twenty-five months, as Dr. Morgan steadfastly refused to reveal the location of Hilary's hideout. See Morgan v. Foretich, 564 A.2d at 3, 21.
 
 
 8
 While Dr. Morgan spent twenty-five months in a D.C. jail, the controversy generated a torrent of publicity. Dr. Morgan and Dr. Foretich (and their lawyers and surrogates) exchanged charges and countercharges. Each parent hired a public relations agent and commissioned a toll-free "800" number. Hundreds of newspaper and magazine articles were published about virtually every aspect of the controversy. The broadcast media devoted extensive coverage to the dispute and to the various public policy debates that it inspired. On Capitol Hill, the House Committee on the District of Columbia, having received "the largest outpouring of mail regarding a single issue" in its history, reported that the affair was "a local and national issue joining together various political, social, and religious organizations."[2] Magazines termed it "a national cause, taken up by feminist groups, talk-show hosts, and columnists"[3] and a "legal battle that made headlines around the world."[4]
 
 
 9
 Over Dr. Foretich's vocal objections, in September 1989 Congress enacted and President Bush signed into law the District of Columbia Civil Contempt Imprisonment Limitation Act of 1989, Pub.L. No. 101-97, 103 Stat. 633 (codified at D.C.Code Secs. 11-721(f), 11-741(b), 11-944(b)). The Act stated that no person could be imprisoned for civil contempt by the D.C. Superior Court for more than twelve months in connection with a child-custody case. It also specified the circumstances under which a criminal contempt conviction could be imposed in a child-custody dispute, and provided for expedited appeals for those incarcerated for contempt in such cases. See id. As a result of the new Act, the D.C. Court of Appeals ordered Dr. Morgan's release. See Morgan v. Foretich, 564 A.2d at 21.
 
 
 10
 In 1990, a private investigator hired by Dr. Foretich found Hilary living with her maternal grandparents in Christchurch, New Zealand. Hilary's father and the paternal grandparents rushed to New Zealand, in whose courts the next chapter of the custody battle ensued. Ultimately, the New Zealand Family Court awarded Dr. Morgan full custody of Hilary, and Dr. Foretich agreed neither to contest custody nor to seek visitations. See generally Jonathan Groner, Hilary's Trial (1991). Today Dr. Morgan and her now-twelve-year-old daughter remain in New Zealand.
 
 B
 
 11
 Central to the resolution of this interlocutory appeal is the nature and extent of Vincent Foretich's and Doris Foretich's participation in the controversy surrounding their granddaughter's custody. Therefore, we will recount the Foretich grandparents' media exposure in some considerable detail.
 
 
 12
 The record does not suggest that either grandparent ever actively sought out press interviews. But, over a period of a few years, and most intensively during and immediately after Dr. Morgan's twenty-five months in jail, they did accede to requests for several newspaper and magazine interviews, attend at least three press conferences or rallies organized by or on behalf of their son, and appear on at least two television shows.[5] The grandparents did not simply confine their remarks to denying Dr. Morgan's allegations. They also described the positive environment that they had provided for Hilary, the negative influence that Dr. Morgan had on the girl, their belief that Dr. Morgan was mentally unstable, and the distress that they had suffered as a result of Dr. Morgan's allegations.[6]
 
 
 13
 The record evidence indicates that the grandparents were first quoted in an article published in The Washington Post in August 1986, immediately after Dr. Morgan filed her federal lawsuit accusing Eric, Vincent, and Doris Foretich of abusing Hilary. The article said that the grandparents "denied the allegations" in Dr. Morgan's complaint and "reacted with dismay and outrage." Sandra G. Boodman, Mother Files Suit Alleging Child Abuse, Wash. Post, Aug. 20, 1986, at C3:
 
 
 14
 "This is filthy dirt created by Elizabeth Morgan," said Doris Foretich, a retired art teacher for the Newport News public schools. "We're not capable of doing things like this." Doris Foretich said that she and her husband lived in Great Falls [Virginia] with their son from June 1983 to June 1985 to help him care for his two daughters, each from a different marriage.[7]
 
 
 15
 Vincent Foretich, former manager of operations for Newport News Shipbuilding and Drydock, called the suits "a heinous lie by a woman who is mentally ill. We are honorable, clean-living people who love our granddaughter and would never abuse her."
 
 
 16
 Id.
 
 
 17
 Six days later, Doris and Vincent Foretich were quoted again on the pages of The Washington Post. Doris Foretich reportedly said, "I sacrificed like nobody's business and so did my husband, and now this.... I can tell you this: We did not abuse her. Ever." Sandra G. Boodman, The Public War over a Child Ugly, Wash. Post, Aug. 26, 1986, at C1. Speaking of her son, Eric, she said, "He loved those little girls [Hilary and her older half-sister] and did everything for them.... He would feed them, change them, everything." Id. She also said that she was
 
 
 18
 confident that her family [would] ultimately be vindicated. "I thought the worst thing in the world was when my children died," Doris Foretich said. (In 1958 the couple's 5-week-old daughter died during a blood transfusion. A decade later their 21-year-old son died in a car accident.) "People would say, 'Doris, there are worse things than death,' and they were right."
 
 
 19
 "I am the kind of person who believes that all truth surfaces," she said. "I believe that God, knowing my husband and Eric, will let justice be done.... In time everyone will know what the truth is."
 
 
 20
 Id. Vincent Foretich commented: "I know my son is a very honorable person despite being married four times." Id. Both of the parents claimed that Dr. Morgan was "mentally ill," and that "the allegations and ensuing investigation [were] the result of a conspiracy between [Dr. Foretich's] second and third wives, who coached their daughters and were assisted in their 'harassment' by the Fairfax [ (Virginia) ] Department of Social Services." Id.
 
 
 21
 Six months later, in February 1987, The Washington Post briefly reported on the grandparents' testimony at the Morgan v. Foretich trial in federal district court:
 
 
 22
 The grandparents of a 4-year-old District child, testifying yesterday in federal court in Alexandria, denied allegations by the child's mother that they sexually abused their granddaughter, calling the charges "ridiculous."
 
 
 23
 . . . . .
 
 
 24
 Doris Foretich, 68, testified she never saw any of the child's alleged abnormal behavior described earlier by Morgan. Asked if she ever sexually abused her granddaughter, she responded: "Never, may I drop dead if that's not true. I love her dearly."
 
 
 25
 Her husband, Vincent, 72, also denied the charges, adding that as a result of Morgan's lawsuit, filed last August, and the publicity that followed, "our reputations have been irreparably damaged."
 
 
 26
 Caryle Murphy, Grandparents Deny Abuse of 4-Year-Old, Wash. Post, Feb. 19, 1987, at C6.
 
 
 27
 The record indicates no further press contacts for Vincent or Doris Foretich before the fall of 1988 (halfway through Dr. Morgan's twenty-five months in jail), when Glamour magazine published an article about the custody dispute. The author, free-lance reporter Bob Trebilcock, spent at least thirty minutes interviewing Hilary's paternal grandparents. See Foretich v. Advance Magazine Publishers, Inc., 765 F.Supp. 1099, 1102 (D.D.C.1991) (citing Bob Trebilcock, Hiding Hilary, Glamour, Nov. 1988).
 
 
 28
 On December 16, 1988, a front-page article in The Washington Post described the scene in the packed courtroom as the D.C. Superior Court Judge denied the then-incarcerated Dr. Morgan's petition for a writ of habeas corpus:
 
 
 29
 "The wrong one's in jail," hissed one Morgan supporter.
 
 
 30
 "Trash," spat back Vincent Foretich, Eric Foretich's father.
 
 
 31
 "Trash is right," said Dorothy [sic] Foretich, the elder Foretich's wife.
 
 
 32
 Barton Gellman, Dr. Morgan Sent Back to Jail, Wash. Post, Dec. 16, 1988, at A1. Apparently, the Post reporter overheard the exchange in the courtroom and did not actually interview either grandparent.
 
 
 33
 Five months later, Vincent and Doris Foretich attended their son's press conference at a hotel in Washington, D.C. See Tr. of Press Conf., May 23, 1989. Vincent Foretich spoke literally one word, responding to a question by saying that Hilary called him "Gramps." Id. Doris Foretich interjected once to say that, when Dr. Morgan first leveled accusations of abuse, she (Doris) had taken Hilary to a doctor: "I had her thoroughly examined, and she found that she was perfectly intact. In fact, she didn't even have diaper rash. She was fine." Id.
 
 
 34
 Two and a half months later, an August 2, 1989 article in the Hampton Roads (Virginia) Daily Press quoted Doris Foretich as saying, "We have been the victims of an absolutely fiendish campaign of terror." Mathew Paust, Father's Dream Turns Nightmare, Daily Press, Aug. 2, 1989, at A1, A8. Vincent Foretich explained that he and his wife switched churches to avoid "embarrassing their friends.... 'They know we haven't done anything, but they feel like they have to console us and try to cheer us up. These are vicious lies that have been devastating to us. We'll carry this to the grave,' Vincent Foretich said." Id.
 
 
 35
 The next day, The Washington Times reported an interview with Dr. Foretich, conducted at his Great Falls home, in which he spoke of the difficulty of "prov[ing] a negative," i.e., that he had not abused Hilary.
 
 
 36
 His parents, Doris and Vincent Foretich of Gloucester Point, Va., have just arrived at the house for a visit after a 50th anniversary trip to Bermuda. They nod their agreement. In Alexandria courts in 1986 and again in 1987 Dr. Morgan accused them, too, of sexually abusing Hilary beginning shortly after the girl's birth. And as Eric Foretich runs down the list of Dr. Morgan's claims against his parents, his mother, a 70-year-old retired art teacher in summery pink, puts her head in her hands and says she doesn't want to hear it again.
 
 
 37
 "If you read her allegations, you would not think a person in her right mind would say that," says Vincent Foretich, 74. He is a retired manager of product engineering for Newport News Shipbuilding. "It was just like from the bottom of a filthy cesspool. I mean, downright filth. That woman is sick, capital letters SICK."
 
 
 38
 From June 1983 to June 1985 the senior Foretichs lived in an upstairs apartment here so they could be present for young Hilary's visits. Later they would drive up from Gloucester Point for each visit, on the advice of a lawyer friend who had warned Dr. Foretich to keep the house in "wall-to-wall people" because of the latest trend in child custody cases--accusations of sexual abuse.
 
 
 39
 "Not only did he have us," Mrs. Foretich says, "but we had many, many children spending the night, and people over from everywhere, and she did it anyway."
 
 
 40
 Cathryn Donohoe, Eric Foretich: Loser in Dr. Morgan's War, Wash. Times, Aug. 3, 1989, at E1.
 
 
 41
 Less than three weeks later, on August 21, 1989, Dr. Foretich held a press conference and rally on the steps of the United States Capitol to celebrate Hilary's seventh birthday and to demonstrate against legislation then pending in Congress, which would result in Dr. Morgan's release from jail. See Tr. of Press Conf., Aug. 21, 1989. Again, Vincent and Doris Foretich accompanied their son. Vincent was introduced as "the paternal grandfather of Hilary Foretich, the father of Eric Foretich, [and] accused of being a child abuser himself." Id. Vincent spoke only one sentence, merely "wish[ing] Hilary a very happy birthday, and may God bless her wherever she is." Id. Next, Doris was introduced, and she spoke about a dozen sentences:
 
 
 42
 The happiest time in my life was when I had my grandchildren there. We moved up from our home in Gloucester to look after them. I bathed and fed them, dressed them, slept with them, loved them. I miss them terribly. I hope she's all right. She told me things that happened in her home that were not very nice. I'm not going to repeat them now. But they were horrible. We loved them. We want to see them again. We pray that she's all right. That's all I can say at this time.
 
 
 43
 Id.
 
 
 44
 A month later, shortly after Dr. Morgan had been released from jail, Dr. Foretich held another press conference, this time in the drawing room of his house. See Tr. of Press Conf., Sept. 27, 1989. Both paternal grandparents were present, but neither spoke. Dr. Foretich's attorney, however, introduced them to the reporters and said:
 
 
 45
 I'd like to tell you that they are wonderful people. They are without both of their granddaughters at this time, which is a human tragedy of the worst sort. This is Doris and Vincent Foretich.... Their rights as grandparents have been violated, absolutely, by Dr. Morgan and her associates.... These two people were part of--were defendants in the case in federal court in Alexandria as harming Hilary. Now, I ask you, does that make any sense?
 
 
 46
 Id.
 
 
 47
 An October 1989 article in Cosmopolitan magazine described another reporter's interview with Dr. Foretich, at his home. The interview lasted five hours, "with only the occasional break while Doris replenishe[d] an iced-tea glass." Barbara Hustedt Crook, Elizabeth Morgan: A Mother Against the System, Cosmopolitan, Oct. 1989, at 238, 241. The reporter also recounted what she saw and heard during the hour or so before Eric's interview:"If you think that after losing two of my children I could be party of anything that would be detrimental to my two granddaughters ...," muses Doris Foretich, allowing the painful thought to trail off. We are sitting in Eric's family room, underneath Doris's painting of [her two granddaughters] (she briefly taught art). "We closed our houses to come here and help take care of those girls. We are God-loving people, law-abiding people. My God knows who's right...."
 
 
 48
 While we wait for Eric to return from his morning run--he is "addicted" to jogging, his father, a retired civil engineer, tells me--the elder Foretiches, who are visiting today, fill in the time as any loving grandparents might, by showing off snapshots. The only difference is that these are piled in neat stacks marked Exhibit A and Exhibit B. Snapshots of a smiling Hilary ... during weekends in Great Falls; in the pool; in the sandbox; by the Christmas tree, surrounded by cousins, neighbors, friends. Later, I will be given a tour of the girls' pink-and-white room, with its canopied double bed, which has been left exactly as it was when the sisters were last here.
 
 
 49
 . . . . .
 
 
 50
 "[Hilary] loved being with us," [Doris Foretich] says. "When Elizabeth came to drop her off, she'd pretend to be crying, then she'd look over her mother's shoulder and grin and wave. The last time she was here, she begged us not to send her home. She said, 'I love my mommy, but there's something wrong with her.' "
 
 
 51
 Id. at 241, 262. Once Eric Foretich arrived and his five-hour interview commenced, "his parents hover[ed] nearby, interjecting cries of 'That's right!' and 'That's exactly right!' " Eric Foretich told the reporter: " 'The only abuser is Elizabeth Morgan.... I think Elizabeth Morgan is a pervert. And I'll say it for your magazine on the record.' " Id. at 241.
 
 
 52
 Also in October 1989, Doris and Vincent Foretich made an appearance on national television. Phil Donahue introduced his show by proclaiming the Morgan-Foretich battle to be "the most widely discussed, reported, antagonistic, protracted, child-custody/domestic-relations accusation case in the history of family law." Tr. of The Phil Donahue Show (national television broadcast, Oct. 25, 1989). Dr. Foretich was the principal invited guest, and his parents were seated in the audience. According to their own deposition testimony, both Vincent and Doris Foretich were familiar with the format of the Phil Donahue Show and with Donahue's proclivity for talking with members of the audience, particularly those with relationships to his main guests. Both had executed "Donahue Guest in Audience Releases" prior to their appearances.
 
 
 53
 When Donahue ran a video clip of Dr. Morgan claiming that Dr. Foretich had himself been a victim of sexual abuse as an adolescent, Dr. Foretich replied, "I was never--my parents are sitting right there. Those two people, do you believe they could have--." Tr. of The Phil Donahue Show (national television broadcast, Oct. 25, 1989). Donahue thrust his microphone in front of Doris Foretich and said, "That's not the first time you've heard that accusation." Id. She replied:
 
 
 54
 Mrs. Foretich: It shocks me every time. He certainly was very much loved. I have lost two of my three children.
 
 
 55
 . . . . .
 
 
 56
 Mrs. Foretich: Yes. One died in an automobile accident on his way back to the University of Virginia his senior year and a little girl died in her infancy from a transfusion.
 
 
 57
 Donahue: Right. And your point is?
 
 
 58
 Mrs. Foretich: My point is that, do you think that any grandmother who has lost two of her own children would ever participate--I moved to this house, and I took sole care of my grandchildren. Do you think anybody like that would ever allow anyone to abuse her grandchildren? ...
 
 
 59
 Dr. Foretich: She accused my parents as well!
 
 
 60
 Mrs. Foretich: Nobody could agonize the way we have. I love that little girl and I would lay down my life for her. She never wanted to leave us. She wouldn't want to talk to her mother on the phone. I had to cajole her to talk with her, because I knew it would give us trouble. There's nothing in the world we would rather do for those children.
 
 
 61
 Id.
 
 
 62
 Later, in response to an audience member's remark, Doris Foretich added:
 
 
 63
 I've taught art for young people for 20 years. I happen to know that children will do anything their mothers tell them to do. And, I'm telling you, they want to please their parents. And whichever parent they're living with, poor little things, they have to, whether they want to or not.
 
 
 64
 Id. Vincent Foretich did not speak during the program.
 
 
 65
 The Phil Donahue Show was not the grandparents' sole television appearance. They also appeared and were interviewed in "Hilary in Hiding," a British-produced television documentary telecast on the Lifetime Cable Channel's "Frontline" program in April 1990. Again, only Doris Foretich spoke, as she showed the reporter her son's home:
 
 
 66
 This is my granddaughter's bedroom. And the little dolls and the pillows and things that you see around, I made for her--the little quilt. And she loved it here. The closet's quite large, as you can see. And we used to take the little quilt that I made her and put it right down here on the floor. She'd sit there and play with her dolls. And she had--of course, we don't have near as many dresses and things now as we did have for her, but it was packed full of all the things that she loved when she was here. And we're living for the day when we could have her back again, have her enjoy her room. It's a nice room. And it was a happy little room for her.
 
 
 67
 Tr. of Frontline (national television cablecast, Apr. 24, 1990).
 
 
 68
 Later in the program Doris Foretich described both her son and her former daughter-in-law:
 
 
 69
 He was determined to play a part in his child's life, and I'm proud of him for that, and would have been most displeased, as his mother, if he hadn't stood up as a man and fought. It would have been so much easier for him to have sort of ducked his tail and slunk away and--never to be heard of again. But that's not his style. That's not our style. We stand up for what we believe in, in our family, and what we know to be a true and right thing to do.
 
 
 70
 . . . . .
 
 
 71
 She [Dr. Morgan] has written many books, and still is, I'm sure, writing books--probably already finished, or well into the making. She's been offered two movie contracts. She had been touted by the women's lib NOW women in this country. She has--she's like a new Joan of Arc. I think that she's got notoriety to be noticed. She's being--money that--all kinds of contracts are offered her. I think that she's more famous than she ever could have hoped to be if she had just been a self-sacrificing mother running away with her little abused daughter. She knows none of this ever happened. She knows in her heart it never happened, as I do.
 
 
 72
 Id.
 
 
 73
 A full-length book on the dispute, Jonathan Groner's Hilary's Trial, published by Simon & Schuster in 1991, relied in part on interviews with the grandmother. Doris Foretich states that she spoke with Groner on occasion on the telephone and one other time when he was visiting Dr. Foretich at the latter's house. According to Doris Foretich, her conversations with Groner consumed a total of at most 30 minutes. There is no evidence that Vincent Foretich and Groner ever spoke.
 
 C
 
 74
 On November 29, 1992, American Broadcasting Companies, Inc. aired, as its "ABC Sunday Night Movie," a 91-minute docudrama entitled "A Mother's Right: The Elizabeth Morgan Story." Being a "docudrama," the made-for-TV movie presented a dramatized and perhaps somewhat fictionalized account, with actors and actresses playing the roles of Dr. Morgan, Dr. Foretich, Hilary, et al.
 
 
 75
 Among the docudrama's scenes was one in which Hilary, then four years old, visits with her father and paternal grandparents at the Washington, D.C. office of a court-appointed psychiatrist. In the scene, Hilary is initially agitated, gradually warms to her grandparents, and eventually climbs into her grandfather's lap after joining in the singing of "Row, Row, Row Your Boat."
 
 
 76
 There immediately follows a conversation between Dr. Morgan and her friend, as they are leaving Washington by car. The friend had brought Hilary to the psychiatrist's office and had remained in an adjacent room during the visit. He describes to Dr. Morgan what he heard: "It was like a circus pony going through her tricks. You know, she even giggled on cue." Dr. Morgan responds, "It's just like the therapist said.... Classic response. She's being kind to her abusers so she won't be hurt again " (emphasis added).
 
 D
 
 77
 The above-quoted dialogue from ABC's docudrama gave rise to the case at bar. Vincent and Doris Foretich filed a diversity action for defamation, intentional infliction of emotional distress, and "insulting words" in the United States District Court for the Eastern District of Virginia, naming as defendants the producers and broadcasters of the ABC docudrama (collectively, "the defendants" or "ABC"). Plaintiffs' entire case is based on the utterance of a single sound--the "s" in the word "abusers," which allegedly indicated that Hilary was being abused not only by her father but also by one or both of her paternal grandparents. At the present stage of the litigation, it is undisputed that the "s" that converted the singular "abuser" into the plural "abusers" was included unintentionally.
 
 
 78
 The defendants filed a motion to dismiss the complaint for failure to state a claim or, alternatively, for summary judgment, arguing that the statement at issue, as a matter of law, could not be construed to defame the plaintiffs. The district court denied the motion, finding the statement capable of defamatory meaning: "[T]he use of the term 'her abusers' [by the actress portraying Dr. Morgan] could be reasonably understood by a [viewer] ... to refer to the plaintiffs as child abusers, and thus to be defamatory." Tr. of Hr'g, Oct. 22, 1993.
 
 
 79
 The defendants then filed a motion in limine requesting a finding that the plaintiffs were "limited-purpose public figures" and therefore would have to prove at trial that the defendants acted with "actual malice" as defined in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The district judge orally denied the motion and held that the plaintiffs were "private individuals" for purposes of their defamation action. Thus, the New York Times "actual malice" standard would not apply.
 
 
 80
 Specifically, the judge stated that the Morgan-Foretich custody fight "was a private controversy that got a lot of publicity [and] notoriety," not a "public controversy." Even if the controversy were "public," the court held that the nature and extent of the Foretich grandparents' participation in the controversy was insufficient to make them "public figures" for the limited purpose of comment on the controversy:
 
 
 81
 [I]f someone is accused as these grandparents were of fairly heinous behavior, ought they be required to sit silently on pain of being declared a public figure and be limited to doing no more than say, "I didn't do it"? Shouldn't they be allowed to attack their accuser without subjecting themselves to being a public figure?
 
 
 82
 . . . . .
 
 
 83
 [O]ught a person such as these plaintiffs be required to limit themselves to merely denials in order not to become a public figure?
 
 
 84
 When he announced the court's decision from the bench, the judge added,
 
 
 85
 These plaintiffs did no more than defend themselves against fairly outrageous, even if true, accusations. And while they aggressively sought to defend themselves, I don't think they injected themselves into a point where they can be considered to have voluntarily assumed the role of prominence to the extent that this can be transformed into a public controversy in which they sought to influence the outcome.
 
 
 86
 The defendants requested an interlocutory appeal, pursuant to 28 U.S.C. Sec. 1292(b). The district court issued a written order noting that "there is substantial ground for differences of opinion." Therefore, the district court stayed the proceeding and certified to this Court the question "whether the plaintiffs are limited-purpose public figures." The defendants filed a petition for interlocutory appeal, which we granted.
 
 II
 
 87
 Because the question of whether a defamation plaintiff is a "limited-purpose public figure" is an issue of law, see Reuber v. Food Chemical News, Inc., 925 F.2d 703, 708 (4th Cir.) (en banc), cert. denied, 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991); Fitzgerald v. Penthouse Int'l, Ltd., 691 F.2d 666, 669-70 (4th Cir.1982), cert. denied, 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983); Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1293 n. 12 (D.C.Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980), we review de novo. In conducting our review, we "must look through the eyes of a reasonable person at the facts taken as a whole." Waldbaum, 627 F.2d at 1292.
 
 III
 
 88
 * Prior to 1964, the common law of defamation strongly favored the State's interest in preventing and redressing injuries to individuals' reputations, and the prevailing view gave little or no weight to First Amendment considerations. See, e.g., Beauharnais v. Illinois, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919 (1952); Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 329, 41 L.Ed. 715 (1897). In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court broke with the common-law tradition and proclaimed that "libel can claim no talismanic immunity from constitutional limitations." Id. at 269, 84 S.Ct. at 720. Specifically, the Court held that the First and Fourteenth Amendments prohibit "a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279-80, 84 S.Ct. at 726.[8] "Actual malice" must be demonstrated with "convincing clarity," id. at 285-86, 84 S.Ct. at 729, i.e., by "clear and convincing proof." Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974).
 
 
 89
 Three years later, the Court extended the application of the New York Times "actual malice" standard to speech about "public figures," but provided little guidance as to which plaintiffs fell into that category. See Curtis Publishing Co. v. Butts, 388 U.S. 130, 162-65, 87 S.Ct. 1975, 1995-96, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in the result).
 
 
 90
 In Gertz v. Robert Welch, Inc., supra, the Court declined to extend the application of the New York Times standard to defamation actions brought by private individuals. In so doing, the Court elaborated a typography of defamation plaintiffs. At one end of the spectrum are "private individuals" and at the other end are "public officials" and "public figures," whom the Court divided into three categories: (1) "involuntary public figures," who become public figures through no purposeful action of their own; (2) "all-purpose public figures," who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; and (3) "limited-purpose public figures," who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues. Gertz, 418 U.S. at 345, 351, 94 S.Ct. at 3009-10, 3012-13.
 
 
 91
 Writing for the majority in Gertz, Justice Powell elaborated:
 
 
 92
 Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.
 
 Id. at 345, 94 S.Ct. at 3009.[9]
 
 93
 The Court made clear that the rationale for extending the application of the New York Times standard to public figures but not to private individuals was twofold. First, public figures are less vulnerable to injury from defamatory statements because of their ability to resort to the "self-help" remedy of rebuttal. They usually enjoy significantly greater access than private individuals to the channels of effective communication, which enable them to counter criticism and to expose the falsehood and fallacies of defamatory statements. Second, and more important, is a normative consideration: public figures are less deserving of protection than private individuals because public figures, like public officials, have voluntarily exposed themselves to increased risk of injury from defamatory falsehood. Id. at 344-45 & 344 n. 9, 94 S.Ct. at 3009 & 3009 n. 9; accord Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 164, 99 S.Ct. 2701, 2705-06, 61 L.Ed.2d 450 (1979); see also Joel D. Eaton, The American Law of Defamation Through GERTZ V. ROBERT WELCH, Inc. and Beyond: An Analytical Primer, 61 Va.L.Rev. 1349, 1420 (1975) ("By voluntarily abandoning anonymity in favor of the public spotlight and its attendant heat, public figures have knowingly exposed themselves to a predictable risk of being burned.").
 
 
 94
 Following Gertz, a defamation plaintiff who is a public official or public figure "may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." Gertz, 418 U.S. at 342, 94 S.Ct. at 3008. That high standard of liability--the New York Times "actual malice" standard--does not apply to private individuals seeking to recover actual compensatory damages. They may recover such damages under any applicable state-law standard except strict liability. Thus, under the laws of most states (including Virginia), a defendant may be held liable for negligently publishing a defamatory falsehood about a private individual. See id. at 347-50, 94 S.Ct. at 3010-12; see also Gazette, Inc. v. Harris, 229 Va. 1, 15, 325 S.E.2d 713, 724-25, cert. denied, 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 653 (1985).
 
 
 95
 On three occasions since Gertz, the Supreme Court has squarely addressed the status of a defamation plaintiff. On each occasion, the Court reversed or vacated the lower court's judgment and held that the plaintiff was a private individual rather than a limited-purpose public figure. See Time, Inc. v. Firestone, 424 U.S. 448, 453-55, 96 S.Ct. 958, 965-66, 47 L.Ed.2d 154 (1976); Hutchinson v. Proxmire, 443 U.S. 111, 134-36, 99 S.Ct. 2675, 2687-88, 61 L.Ed.2d 411 (1979); Wolston, 443 U.S. at 166-69, 99 S.Ct. at 2707-08.[10] See generally Rodney A. Smolla, Law of Defamation Sec. 2.08, at 2-23 (1993) ("In the aftermath of Gertz, the Supreme Court undertook a series of refinements of the 'limited' public figure, consistently giving the term an application more restricted in scope than the simple word 'public' might suggest as a matter of popular colloquial usage.").
 
 B
 
 96
 In the course of deciding Gertz, Firestone, Hutchinson, and Wolston, the Court developed a two-part inquiry for determining whether a defamation plaintiff is a limited-purpose public figure. First, was there a particular "public controversy" that gave rise to the alleged defamation? Second, was the nature and extent of the plaintiff's participation in that particular controversy sufficient to justify "public figure" status? See Clyburn v. News World Communications, Inc., 903 F.2d 29, 31-32 (D.C.Cir.1990) (describing Gertz and its progeny); Clark v. American Broadcasting Cos., 684 F.2d 1208, 1218 (6th Cir.1982) (same), cert. denied, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983); see also Laurence H. Tribe, American Constitutional Law Sec. 12-13, at 880-81 (2d ed.1988).
 
 
 97
 We have previously engaged in the same two-part inquiry, sometimes finding that the defamation plaintiff was a private individual, see, e.g., Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 686-89 (4th Cir.1989); Jenoff v. Hearst Corp., 644 F.2d 1004, 1007-08 (4th Cir.1981), and at other times finding that the plaintiff was a limited-purpose public figure, see, e.g., Reuber, 925 F.2d at 708-11; National Found. for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc., 705 F.2d 98, 101-02 (4th Cir.), cert. denied, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); Fitzgerald, 691 F.2d at 668-70, 672.
 
 
 98
 We have proceeded upon the initial presumption that the defamation plaintiff is a private individual, subject to the defendant's burden of proving that the plaintiff is a public figure to whom the New York Times standard applies. In Fitzgerald and again in our en banc opinion in Reuber, we set forth five requirements that the defamation defendant must prove before a court can properly hold that the plaintiff is a public figure for the limited purpose of comment on a particular public controversy: (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation. See Reuber, 925 F.2d at 708-11; Fitzgerald, 691 F.2d at 668. Typically, we have combined the second and third requirements, to ask "whether the plaintiff ha[d] voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy." Reuber, 925 F.2d at 709 (citing Fitzgerald, 691 F.2d at 668); see id. at 708 (holding that the plaintiff "voluntarily injected himself into a public controversy 'in order to influence the resolution of the issues involved' " (quoting Gertz, 418 U.S. at 345, 94 S.Ct. at 3009-10)); see also Fitzgerald v. Penthouse Int'l, Ltd., 525 F.Supp. 585, 593 (D.Md.1981) (asking whether the plaintiff "voluntarily engaged the public's attention prior to the alleged defamation, in a significant way, in order to influence the outcome of a particular controversy"), aff'd in relevant part, 691 F.2d 666 (4th Cir.1982), cert. denied, 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983).[11]
 
 IV
 
 99
 The first question we must address is whether there was a particular public controversy that gave rise to the alleged defamation.
 
 
 100
 * Gertz provided no express definition of a "public controversy," but the Court's subsequent decisions on limited-purpose public figure status provide some useful guidance. In Firestone, supra, the alleged controversy was the divorce of Mary Alice Firestone from Russell Firestone, the scion of one of America's wealthiest industrial families. In holding that Ms. Firestone was not a limited-purpose public figure, the Supreme Court refused "to equate 'public controversy' with all controversies of interest to the public." 424 U.S. at 454, 96 S.Ct. at 965. The Court rejected the notion that news coverage of a "cause celebre" could create a "public controversy," in the constitutional sense: "Dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in Gertz, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public." Id. Thus, the mere facts that a dispute was litigated and that the litigation garnered some news coverage do not, by themselves, render the dispute a "public controversy." See id. at 453-57, 94 S.Ct. at 3057-59; Wolston, 443 U.S. at 167-69, 99 S.Ct. at 2707-08.[12]
 
 
 101
 In 1980, after carefully sifting through the Supreme Court cases, the United States Court of Appeals for the District of Columbia Circuit enunciated an express definition of a "public controversy":
 
 
 102
 A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way.... [E]ssentially private concerns or disagreements do not become public controversies simply because they attract attention.... Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.
 
 
 103
 Waldbaum, 627 F.2d at 1296 (citation and footnote omitted); see id. at 1292 (defining a "public controversy" as "a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants"); see also Tavoulareas v. Piro, 817 F.2d 762, 772-75 (D.C.Cir.) (en banc) (reaffirming and applying the Waldbaum test), cert. denied, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); Smolla, supra, Sec. 2.12, at 2-37 ("To the extent that one of the primary First Amendment values protected by Gertz is the allowance of breathing space for speech directed at the resolution of issues of social concern, it makes sense to inquire whether persons other than the immediate participants in the controversy are affected by it." (footnote omitted)).
 
 
 104
 We subsequently adopted the D.C. Circuit's definition. See Blue Ridge Bank v. Veribanc, Inc., 866 F.2d at 688 n. 12 (quoting Waldbaum, 627 F.2d at 1296).
 
 B
 
 105
 Next we must determine whether the above-quoted definition encompasses the Morgan-Foretich dispute. We are not, however, the first court to address precisely that question. In 1991, in a defamation action that Dr. Foretich and his parents brought against the publishers of Glamour magazine, the United States District Court for the District of Columbia, per the late Judge Gesell, held that the Morgan-Foretich dispute was a "public controversy," within the meaning of Gertz, Waldbaum, and their progeny:
 
 
 106
 The controversy and the rulings of the presiding [District of Columbia] Superior Court judge engendered discussion on issues of public concern, including child abuse, women's rights, the intrusion of the state into private affairs, and the limits of punishment for contempt of court.
 
 
 107
 . . . . .
 
 
 108
 [T]he many public policy issues raised by the Morgan-Foretich dispute made it a genuine public controversy, not merely a lurid personal matter that captured only the voyeuristic attention of the public. Compare Time, Inc. v. Firestone, [supra ].
 
 
 109
 Foretich v. Advance Magazine Publishers, Inc., 765 F.Supp. at 1102, 1107-08; see also Foretich v. CBS, Inc., 619 A.2d 48, 52 (D.C.1993) (plaintiff Dr. Foretich and codefendant Dr. Morgan stipulated that they were both limited-purpose public figures and that therefore, implicitly, their dispute was a "public controversy").
 
 
 110
 For the first time at oral argument on appeal, ABC argued that Judge Gesell's ruling should have collateral estoppel effect here. We need not address the collateral estoppel issue because our independent evaluation of the facts of the case leads us to the same conclusion that Judge Gesell reached.
 
 
 111
 There was ample evidence that the Morgan-Foretich dispute "received public attention because" it had "foreseeable and substantial ramifications for persons beyond its immediate participants." See Waldbaum, 627 F.2d at 1292, 1296. A search of Mead Data Central's NEXIS database reveals more than one thousand news reports on the Morgan-Foretich dispute. The custody battle heightened social awareness of child-abuse allegations and their role in custody disputes, and raised several substantial questions for public debate, including how best to determine which parent is more "fit," how courts can best protect a child's interests during a prolonged custody fight, and what should be the proper role of psychiatric and social-work experts.
 
 
 112
 Furthermore, Dr. Morgan's prolonged contempt incarceration for refusing to divulge Hilary's whereabouts raised a special set of public policy issues. According to one congressional report, the controversy implicated "local and national issue[s] joining together various political, social, and religious organizations," including the National Organization for Women, the American Civil Liberties Union, Fathers for Equal Rights, the National Network for Victims of Sexual Assault, the Prison Fellowship Ministries, and the National Congress of Men. Civil Contempt Hearing, supra note 2, at v. The public discussion of those issues ultimately prompted Congress and the President to secure Dr. Morgan's release through federal legislation limiting the power of the District of Columbia courts to impose contempt in child-custody cases. Clearly, the impact of the Morgan-Foretich battle--unlike most child-custody disputes--was felt far beyond the confines of the Morgan and Foretich homes. Therefore, we conclude that the Morgan-Foretich dispute was a "public controversy," within the meaning of Gertz and its progeny.
 
 V
 
 113
 Having concluded that there was indeed a public controversy that gave rise to the alleged defamation, we must next examine "the nature and extent of [Vincent Foretich's and Doris Foretich's] participation in [that] controversy." Gertz, 418 U.S. at 352, 94 S.Ct. at 3013. In conducting that examination, we are guided by the five-part test that we set forth in Fitzgerald, supra, and reiterated in Reuber, supra: (1) whether Vincent and Doris Foretich had access to channels of effective communication; (2) whether Vincent and Doris Foretich voluntarily assumed roles of special prominence in the Morgan-Foretich public controversy; (3) whether Vincent and Doris Foretich sought to influence the outcome of the controversy; (4) whether the controversy existed prior to ABC's broadcast of the allegedly defamatory statement; and (5) whether Vincent and Doris Foretich retained public-figure status at the time of the broadcast. See Reuber, 925 F.2d at 708-11; Fitzgerald, 691 F.2d at 668. Because we find that neither Vincent nor Doris Foretich voluntarily assumed a role of special prominence in the Morgan-Foretich controversy in order to influence its outcome, we need not consider the other elements of the Fitzgerald /Reuber test. See Reuber, 925 F.2d at 708-09 (citing Gertz, 418 U.S. at 345, 94 S.Ct. at 3009-10; Fitzgerald, 691 F.2d at 668).[13]
 
 
 114
 * The bare words of the legal test--whether the plaintiff "voluntarily assumed a role of special prominence in a public controversy in order to influence its outcome"--can best be illuminated by reference to Gertz and subsequent Supreme Court cases, particularly Firestone and Wolston. In Gertz, the Court spoke of limited-purpose public figures as those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U.S. at 345, 94 S.Ct. at 3009; see also id. at 351, 94 S.Ct. at 3013 (referring to persons who "voluntarily inject[ ] [themselves] ... into a particular public controversy ... [and] assume special prominence in the resolution of public questions"). The plaintiff, attorney Elmer Gertz, had voluntarily associated himself with a case that was likely to receive extensive media exposure when he agreed to represent, in civil litigation, the family of a boy who had been shot and killed by a Chicago police officer. Nevertheless, the Court held that Gertz was not a limited-purpose public figure:
 
 
 115
 [H]is participation related solely to his representation of a private client. He took no part in the criminal prosecution of Officer Nuccio [the man charged with murdering the boy]. Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome.
 
 
 116
 Id. at 352, 94 S.Ct. at 3013.
 
 
 117
 In Firestone, the Court stated that Mary Alice Firestone's divorce was not a public controversy, but that even if it were, she "did not thrust herself to the forefront of [that] controversy in order to influence the resolution of the issues involved in it." 424 U.S. at 453, 96 S.Ct. at 965. Therefore, she was not a public figure for the purpose of comment on her divorce. See id. Then-Justice Rehnquist, speaking for the Court, explained that Firestone
 
 
 118
 [did not] freely choose to publicize issues as to the propriety of her married life. She was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony.... [I]n such an instance resort to the judicial process ... is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court.
 
 
 119
 Id. at 454, 96 S.Ct. at 965 (citation and internal quotation marks and brackets omitted). The Court went on to explain that most participants in litigation resemble Firestone and should not be deemed public figures, even for the limited purpose of comment on the litigation: they are "drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others." Id. at 457, 96 S.Ct. at 967; see also Wolston, 443 U.S. at 169, 99 S.Ct. at 2708 (To hold that all persons convicted of a crime automatically become public figures "would create an 'open season' for all who sought to defame [them].").
 
 
 120
 Furthermore, the Court was not swayed by the fact that Firestone had held several press conferences "during the divorce proceedings in an attempt to satisfy inquiring reporters.... Such interviews should have had no effect upon the merits of the legal dispute between [Firestone] and her husband or the outcome of that trial, and we ... [cannot] assume[ ] that any such purpose was intended." Firestone, 424 U.S. at 454-55 n. 3, 96 S.Ct. at 965-66 n. 3.
 
 
 121
 In Wolston, the defendant argued that the plaintiff was a public figure for the limited purpose of comment on the public controversy surrounding the investigation of Soviet espionage in the United States in the 1950s. In 1958, Ilya Wolston had pleaded guilty to a criminal contempt charge for failing to testify before a grand jury investigating Soviet intelligence activities. Wolston's plea was reported in the Washington and New York newspapers. Years later, a book was published which falsely named Wolston as a Soviet agent who had been indicted for espionage. Wolston sued for libel. See Wolston, 443 U.S. at 159-63, 99 S.Ct. at 2703-05.
 
 
 122
 Then-Justice Rehnquist, speaking for the Court, rejected the argument that Wolston had "voluntarily thrust" or "injected" himself into the forefront of any public controversy:
 
 
 123
 It would be more accurate to say that [Wolston] was dragged unwillingly into the controversy. The Government pursued him in its investigation. [He] did fail to respond to a grand jury subpoena, and this failure, as well as his subsequent citation for contempt, did attract media attention. But the mere fact that [he] voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public-figure status.... [Wolston] never discussed this matter with the press and limited his involvement to that necessary to defend himself against the contempt charge. It is clear that [he] played only a minor role in whatever public controversy there may have been concerning the investigation of Soviet espionage. We decline to hold that his mere citation for contempt rendered him a public figure for purposes of comment on the investigation of Soviet espionage.
 
 
 124
 . . . . .
 
 
 125
 Nor do we think that [Wolston] engaged the attention of the public in an attempt to influence the resolution of the issues involved.... His failure to respond to the grand jury's subpoena was in no way calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue. He did not in any way seek to arouse public sentiment in his favor and against the investigation. Thus, this is not a case where a defendant invites a citation for contempt in order to use the contempt citation as a fulcrum to create public discussion about the methods being used in connection with an investigation or prosecution.
 
 
 126
 Id. at 166-68, 99 S.Ct. at 2707; see also Hutchinson, 443 U.S. at 135-36, 99 S.Ct. at 2688 (noting that, although the plaintiff had been a writer for professional journals, he had not thrust himself or his views into the public eye).
 
 B
 
 127
 Having reviewed the relevant Supreme Court precedents, we now may proceed to examine the nature and extent of Vincent Foretich's and Doris Foretich's participation in the Morgan-Foretich controversy and to determine whether they voluntarily assumed roles of special prominence in that controversy in order to influence its outcome. ABC has argued that Vincent and Doris Foretich voluntarily participated in the public controversy when they chose to support their son by publicly criticizing Dr. Morgan, by speaking with news reporters, and by appearing on television, at press conferences, and at public gatherings. The Foretiches' public comments and appearances, ABC has contended, were aimed at swaying public opinion in favor of their son and against his former wife. Furthermore, ABC has argued, the grandparents did not confine their public comments and appearances to answering Dr. Morgan's charges against them; they also sought to improve their son's image and to convince the public of Dr. Morgan's instability, irrationality, and, ultimately, unfitness to retain custody of Hilary. Specifically, ABC has claimed that Dr. Foretich's parents wittingly allowed their son to use them as "props" in a strategy of "high theater": Dr. Foretich would highlight the heinous charges that Dr. Morgan had leveled against his elderly and dignified-looking parents, and then ask his audiences rhetorically whether such grandparents could have possibly committed those vile acts, or whether, instead, the fact that Dr. Morgan had made such accusations demonstrated her "bizarre" and "unbalanced" personality. By ABC's account, the Foretiches--not Dr. Morgan--were responsible for the continued publicity surrounding the charges of grandparental abuse. Therefore, ABC has argued, both Vincent and Doris Foretich voluntarily assumed special roles of prominence in the Morgan-Foretich controversy in order to influence its outcome, and they may not now claim the protections of purely "private" persons.
 
 
 128
 We reject ABC's argument because it pays inadequate attention to the context in which the Foretiches made their public comments and appearances, and, as a result, undervalues their interest in defending their own reputations against the extraordinary attacks launched by Dr. Morgan. The complaint that Dr. Morgan filed in federal district court in 1986 accused the Foretich grandparents of performing very specific sex acts with Hilary, then a three-year-old girl.[14] Those accusations were immediately publicized in The Washington Post and later were republished in dozens, if not hundreds, of news articles and broadcasts disseminated over the following months and years. The resultant publicity doubtless had the potential to destroy Vincent Foretich's and Doris Foretich's reputations, and that potential may well have been realized.
 
 
 129
 The common law of defamation has long recognized that charges such as those leveled against the Foretich grandparents are so obviously and materially harmful to reputational interests that they must be deemed defamatory per se.[15] We, too, recognize the devastation that public accusations of child sexual abuse can wreak, and we are extremely reluctant to attribute public-figure status to otherwise private persons merely because they have responded to such accusations in a reasonable attempt to vindicate their reputations.
 
 
 130
 Therefore, we hold that a person who has been publicly accused of committing an act of serious sexual misconduct that (if committed in the place of publication[16] and proved beyond a reasonable doubt) would be punishable by imprisonment cannot be deemed a "limited-purpose public figure" merely because he or she makes reasonable public replies to those accusations.[17] Because Dr. Morgan publicly accused both Vincent and Doris Foretich of committing such acts,[18] we next must consider whether the Foretiches' public comments and appearances, see supra Part I-B, predominantly were reasonable replies to Dr. Morgan's accusations of child sexual abuse. If they were, the Foretiches remain private individuals; if not, the Foretiches must be deemed public figures for purposes of the present litigation.
 
 C
 
 131
 In determining the reasonableness of a reply, we need not plow entirely new ground: the common law on the conditional (or qualified) privilege of reply, also known as the privilege to speak in self-defense or to defend one's reputation, can help guide our discussion. Under the common law, the publication of a defamatory attack constitutes an "occasion" triggering the conditional privilege of reply, but the protection of that privilege is lost if it is "abused." As a leading commentator on libel and slander explained more than a century ago:
 
 
 132
 Every man has a right to defend his character against false aspersion. It may be said that this is one of the duties that he owes to himself and to his family. Therefore communications made in fair self-defense are privileged. If I am attacked in a newspaper, I may write to that paper to rebut the charges, and I may at the same time retort upon my assailant, when such retort is a necessary part of my defense, or fairly arises out of the charges he has made against me.
 
 
 133
 William Blake Odgers, A Digest of the Law of Libel and Slander (1st Am. ed. Bigelow 1881), quoted in Chaffin v. Lynch, 83 Va. 106, 1 S.E. 803, 811 (1887).[19]
 
 
 134
 One may abuse, and thus lose, his conditional privilege of reply if, inter alia, (1) his reply includes substantial defamatory matter that is "irrelevant" or "non-responsive" to the initial attack; (2) his reply includes substantial defamatory matter that is "disproportionate" to the initial attack; or (3) the publication of his reply is "excessive," i.e., is addressed to too broad an audience. See Restatement (Second) of Torts Secs. 599, 603-605 (1977); Annotation, supra note 19, Sec. 2[a], at 1086 & nn. 9-15; id. Sec. 5[a], at 1091-96 (collecting cases on the relevance of the reply to the initial attack); id. Sec. 5[b], at 1096-99 (collecting cases on the proportionality of the reply); Ransom P. Reynolds, Jr., Comment, Self-defense in Defamation or "Re-tort Not Reply", 34 Alb.L.Rev. 95, 96-100 (1969). Our reading of the extensive case law on abuse of the privilege of reply, see infra, demonstrates, however, that a public response to a public attack may be "uninhibited, robust, and wide-open," New York Times, 376 U.S. at 270, 84 S.Ct. at 721, without stepping over the line into abuse.
 
 
 135
 Here, we will apply the same general principles to determine whether the Foretiches' public comments and appearances were (1) responsive to Dr. Morgan's attacks; (2) proportionate to those attacks; and (3) not excessively published. Together, those three inquiries will determine whether the Foretiches' public comments and appearances were predominantly, on the one hand, reasonable replies to Dr. Morgan's accusations of child sexual abuse, or, on the other hand, efforts to assume special roles of prominence in the Morgan-Foretich controversy in order to affect its outcome.[20] By borrowing well-established principles regarding the abuse of the privilege of reply, and applying them to the question of whether a defamation plaintiff is a public figure or a private individual, we hope to import decades of accumulated wisdom from the common law into a relatively recent constitutional doctrine.
 
 
 136
 (1)
 
 
 137
 As to the first requirement of reasonableness--that the reply be responsive to the initial attacks--we begin with Dean Prosser's admonition that a person attacked must not add "anything irrelevant and unconnected with the charges made against him, as where he attempts to refute an accusation of immorality by saying that [his accuser] has stolen a horse." Prosser and Keeton on the Law of Torts, supra note 19, Sec. 115, at 825. A supposed "reply" is not truly a reply if it is "patently unrelated to the subject matter" of the antecedent attack.[21] One may not "publish any and all kinds of charges against the offender, upon the theory that they tend to degrade him, and thereby discredit his [accusations]."[22] To be responsive, a reply's contents must clearly relate to its supposed objective--blunting the initial attack and restoring one's good name.[23] Statements that simply deny the accusations, or directly respond to them, or express one's impressions upon first hearing them are certainly responsive.[24] So, too, are statements impugning the motives of the accuser:[25] "One in self-defense is not confined to parrying the thrusts of his assailant."[26] If, however, one's reply exceeds the scope of the original attack,[27] ] and says more than reasonably appears to be necessary to protect his reputation,[28] it is not reasonably responsive.
 
 
 138
 The Foretiches' public comments and appearances were, in large part, relevant and responsive to Dr. Morgan's accusations against them. They made no public statements until after Dr. Morgan's federal complaint was filed and publicized in August 1986. At that time, their first reactions were to deny the allegations in a concise, forthright fashion. Later, they spoke to reporters in more detail about themselves, their son, and Dr. Morgan.
 
 
 139
 Most of the Foretiches' statements about themselves were relevant to the attacks against them. For example, it was clearly relevant for Doris Foretich to describe how she had taken Hilary to a doctor, who examined her and found absolutely no physical evidence of abuse. The Foretiches' more general self-descriptions--as "God-loving," "law-abiding," "honorable, clean-living people"--may or may not have sounded convincing, but they were certainly relevant to refuting Dr. Morgan's charges of child molestation. The same can be said for Doris Foretich's repeated attempts to explain that her loss of two children made it impossible for her to mistreat her granddaughters. Both Doris and Vincent Foretich described the sacrifices that they had made to assist their son in raising Hilary--moving from Gloucester to Great Falls; sewing quilts on which Hilary could play with her toys; supplying her with nice clothes and dolls and a pleasant room. Those selfless efforts to enhance the quality of their granddaughter's life tend to contradict the image that Dr. Morgan had painted of her former in-laws as depraved child molesters. Furthermore, the grandparents' descriptions of how they missed Hilary, and of their prayers for her, and of wanting to see her again all served to bolster their denials of Dr. Morgan's allegations. On the other hand, their lengthy descriptions of how the charges had damaged their own lives were not particularly relevant or responsive, but our examination of the record suggests that those descriptions were relatively innocuous.
 
 
 140
 The Foretiches' descriptions of their son Eric also were relevant to the accusations of child abuse. They described him as a "very honorable person" who stood up and fought for his parental rights and who loved and had attentively cared for his daughters. That description was bolstered by the Foretiches' willingness to stand beside him at press conferences and public gatherings. Doris Foretich's statement on the Donahue Show--that Eric had been "very much loved" as a child--was a clear, direct response to the showing of a videotape in which Dr. Morgan alleged that Eric had been abused as an adolescent (presumably either by his parents or with their acquiescence).
 
 
 141
 The grandparents' remarks about Dr. Morgan also were, in large part, relevant. Doris Foretich stated that Dr. Morgan "knows in her heart that it [the alleged sexual abuse of Hilary] never happened." Doris Foretich impugned Dr. Morgan's motives by describing the offers of book and movie contracts, the fame, and the high status in the women's movement that had accrued to Dr. Morgan, all as a result of her public campaign against Hilary's father and paternal grandparents. Furthermore, Doris Foretich at least implied that Hilary had been mistreated, if not abused, at the hands of her mother. That allegation was highly relevant, for it suggested that Dr. Morgan may have accused the Foretiches in an attempt to camouflage her own misdeeds.
 
 
 142
 Neither Doris nor Vincent Foretich strayed far beyond those points. For example, neither attacked Dr. Morgan's qualifications or competence as a physician. Nor did they recount any general impressions of Dr. Morgan that they had formed during her brief marriage to their son. Moreover, they never commented directly on Dr. Morgan's contempt citation or imprisonment, on the legislation pending in Congress, or on how the D.C. courts should rule on the ultimate questions of custody and visitation rights. Rather, the Foretiches adhered quite closely to the topics most relevant to rebutting the allegations of child sexual abuse against them.
 
 
 143
 (2)
 
 
 144
 Next we must determine whether the Foretiches' public statements were "reasonably proportionate to the magnitude of the ... first attack."[29] In making that determination, we remain at all times aware that the allegation initially leveled here--concerning mistreatment of a little girl--was as destructive to reputation as virtually any charge imaginable. Thus, a reply would have to be truly outrageous before we would deem it "altogether disproportionate to the occasion." Montgomery Ward & Co. v. Watson, 55 F.2d 184, 188 (4th Cir.1932). Nonetheless, we think it is important to sketch a few general guidelines for evaluating the proportionality of a reply to a public accusation of criminal sexual misconduct.
 
 
 145
 Turning again to the common law, we observe that a person under attack may properly allege, in Dean Prosser's words, "that his accuser is an unmitigated liar and the truth is not in him." Prosser and Keeton on the Law of Torts, supra note 19, Sec. 115, at 825; see also Tomson v. Stephan, 699 F.Supp. 860, 864 (D.Kan.1988); Gregory v. Durham County Bd. of Educ., 591 F.Supp. 145, 156 (M.D.N.C.1984); Restatement (Second) of Torts Sec. 594 cmt. k (1977).
 
 
 146
 More than a century ago, Virginia's highest court countenanced a reply that labeled an accusation "a contemptible, cowardly, malicious lie" and referred to its source as a "scoundrel" who "could not [be] recognized ... in the way a gentleman should be recognized." Chaffin v. Lynch, 1 S.E. at 813 (internal quotation marks omitted). "Honest indignation and strong words,"[30] "colorful verbiage,"[31] and even hyperbole and "exaggerated statements" of fact[32] all may be uttered in self-defense without stepping over the line into unreasonable behavior. A person replying to an attack may not, however, "indulge[ ] in language that is unnecessarily defamatory."[33] Nor may he carry out his mission with "excessive enthusiasm or ceremonial flair,"[34] or "avail[ ] himself of the occasion to gratify his malice" against his accuser.[35] If he employs language that is "so intemperate or violent as to be of itself evidence of [spite]," he may be deemed to have acted unreasonably.[36]
 
 
 147
 We do not believe that the Foretiches' public comments came even close to being disproportionate to Dr. Morgan's attacks. They described their former daughter-in-law as "mentally ill," "sick," and "not in her right mind." They labeled her allegations as "heinous lie[s]," "downright filth," and "filthy dirt"--"like from the bottom of a cesspool." Those remarks may have been rather strong, but not when compared to Dr. Morgan's accusations. In explaining the common-law requirement of proportionality, a New York court once stated: "If a man, with equal physique, attacks another with his fists, it may not justify the use of a firearm in response." Shenkman v. O'Malley, 2 A.D.2d 567, 576, 157 N.Y.S.2d 290, 299 (1956). The present case more closely resembles the use of fists in response to firearms. Therefore, the Foretiches' public comments and appearances easily pass the "proportionality" test.(3)
 
 
 148
 Finally, in considering the reasonableness of the Foretiches' public statements, we must ask to whom those statements were directed. "Excessive publication is conceptually parallel to the use of excessive force in self-defense [of one's person or property]." Smolla, supra, Sec. 8.08, at 8-23. "The reply must reasonably focus on the audience which heard the attack."[37] If an accusation of criminal sexual misconduct had been published only to a very limited audience, it obviously would be an abuse to respond in every newspaper and on every television and radio station in the country. But where the original attack was widespread, the response can be widely disseminated as well. In other words, the counterattack must be made primarily in the forums selected by the original attacker.[38]
 
 
 149
 The record evidence suggests that the Foretiches' public statements were made only to reporters from media outlets that had already aired, or were planning soon to air, Dr. Morgan's accusations against them and their son. The Foretich grandparents did not reach out to additional media outlets, and thereby to new audiences, in an effort to expand the circle of persons familiar with the controversy. Rather, they targeted their message toward those persons in whose eyes their reputations already had been (or soon would be) sullied. Thus, their replies were not excessive.
 
 
 150
 (4)
 
 
 151
 Because the Foretiches' public responses to Dr. Morgan's accusations were responsive, proportionate, and not excessively published, they were "reasonable." We acknowledge that some of their public statements were probably intended (at least in part) to influence the outcome of the custody dispute or of the legislative debate in Congress. But we also recognize that, in the circumstances of this particular case, it is almost impossible to extricate statements made in self-defense from statements intended to influence the outcome of the controversy. A favorable outcome of the ultimate dispute-- i.e., granting custody of Hilary, or at least unsupervised visitation rights, to Dr. Foretich--would have done more to vindicate Vincent and Doris Foretiches' reputations than any reply could have ever accomplished. Looking "through the eyes of a reasonable person at the facts taken as a whole," Waldbaum, 627 F.2d at 1292, we conclude that the Foretiches' primary motive was to defend their own good names against Dr. Morgan's accusations and that their public statements can most fairly be characterized as measured defensive replies to her attacks, rather than as efforts to thrust themselves to the forefront of a public controversy in order to influence its outcome. Therefore, we hold that Vincent and Doris Foretich were private individuals, not limited-purpose public figures.
 
 
 152
 Furthermore, we note that--were we to hold otherwise--our decision would necessarily have an unsettling breadth: the Foretiches would be required to demonstrate actual malice in order to recover damages for defamation not only from ABC, but also from any media or nonmedia defendant who repeated ABC's statement that they had abused Hilary.[39] Such a result effectively "would create an 'open season' for all who sought to defame" Vincent and Doris Foretich. Wolston, 443 U.S. at 169, 99 S.Ct. at 2708. We see no reason to expose the Foretiches, or other similarly situated persons, to such a potential barrage.
 
 VI
 
 153
 In the three decades since the Supreme Court handed down its decision in New York Times Co. v. Sullivan, we have struggled to find the proper balance between the protection of reputational interests, on the one hand, and of free expression, on the other. At first blush, one might characterize our decision today as favoring the former over the latter. But such a characterization would miss the point. We see no good reason "why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from defamation." Clyburn, 903 F.2d at 32. By allowing the Foretiches to defend their good names without succumbing to public-figure status, we protect not only their own interests in reputation, but also society's interest in free speech. Further extending the New York Times actual-malice standard here would serve only to muzzle persons who stand falsely accused of heinous acts and to undermine the very freedom of speech in whose name the extension is demanded. By freely permitting the Foretiches to respond to Dr. Morgan's charges against them--charges that have never been proved in any court of law--we foster both the individual interest in self-expression and the social interest in the discovery and dissemination of truth--the very goals that animate our First Amendment jurisprudence.
 
 VII
 
 154
 Accordingly, we affirm the district court's ruling that both Vincent and Doris Foretich were private individuals, not public figures, and we remand the case for further proceedings consistent with this opinion.
 
 
 155
 AFFIRMED AND REMANDED.
 
 
 
 [1]
 The district court dismissed the case in late November 1988 after Dr. Morgan willfully refused to cooperate with a discovery request made by Dr. Foretich
 
 
 [2]
 Civil Contempt: Limiting Incarceration: Hearing and Markups Before the House Subcomm. on Judiciary and Education and the Comm. on the District of Columbia, 101st Cong., 1st Sess. v (1989) (Staff Summary of Findings and Conclusion) [hereinafter Civil Contempt Hearing ]
 
 
 [3]
 Bella English, In the Best Interests of the Child?, Boston Globe Mag., July 16, 1989, at 16, 18
 
 
 [4]
 A Mother Finds Safety in Exile, People Mag., Mar. 7, 1994, at 150
 
 
 [5]
 There is no genuine factual dispute regarding the extent of the Foretich grandparents' involvement in the controversy
 
 
 [6]
 We focus primarily on the Foretiches' verbatim quotes, because it is difficult to tell when a reporter may have paraphrased them and it is impossible to know when (if ever) they spoke with reporters "on background." The Foretiches do not contest the accuracy of any of the quotes attributed to them in the newspaper and magazine articles
 
 
 [7]
 Hilary had an older half-sister who was the daughter of Dr. Foretich and his second wife. Dr. Morgan was his third wife. Eventually, both former wives leveled accusations of abuse against Dr. Foretich. A state court later found that Dr. Foretich had not abused Hilary's half-sister
 
 
 [8]
 The "actual malice" standard has nothing to do with "bad motive" or "ill will" or "malice" in the ordinary sense of the term. See Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 666 & n. 7, 109 S.Ct. 2678, 2685 & n. 7, 105 L.Ed.2d 562 (1989); see also Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991) ("Actual malice under the New York Times standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.")
 To prove that a false statement was made with "reckless disregard" of whether it was false or not, the plaintiff must show that the defendant (1) published the statement with a "high degree of awareness of ... probable falsity," Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), or (2) "in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); accord Masson, 501 U.S. at 510, 111 S.Ct. at 2429; Harte-Hanks, 491 U.S. at 667, 109 S.Ct. at 2685-86.
 
 
 [9]
 The Court also stated that the "public figure" designation
 may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.
 Id. 418 U.S. at 351, 94 S.Ct. at 3012-13.
 
 
 [10]
 In the decade and a half since Hutchinson and Wolston, the Justices have mentioned "limited-purpose public figure" status only twice: in a 1985 dissent from a denial of certiorari, Lorain Journal Co. v. Milkovich, 474 U.S. 953, 953-65, 106 S.Ct. 322, 322-30, 88 L.Ed.2d 305 (1985) (Brennan, J., joined by Marshall, J.); and in a footnote to the Court's seminal summary-judgment decision, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 n. 3, 106 S.Ct. 2505, 2509 n. 3, 91 L.Ed.2d 202 (1986), which briefly quoted Gertz, 418 U.S. at 351, 94 S.Ct. at 3012-13, and cited with approval Waldbaum, 627 F.2d at 1292 ("[A] person has become a public figure for limited purposes if he is attempting to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants.")
 
 
 [11]
 From the point of view of the defendants, who bear the burden of proof, the five-part Fitzgerald /Reuber test is relatively stringent. By comparison, the D.C. Circuit's test requires the defendant to prove only that the plaintiff "played a sufficiently central role in the controversy." Clyburn, 903 F.2d at 31. See generally Smolla, supra, Secs. 2.09-2.20, at 2-29 to -61 (describing variations among the lower courts' tests)
 
 
 [12]
 In Wolston, the Court also suggested in dicta that there can be no "public controversy" unless the issues involved were truly divisive, or subject to debate. See 443 U.S. at 166 n. 8, 99 S.Ct. at 2707 n. 8 (stating that there was no identifiable public controversy or debate in 1958 about the desirability of permitting Soviet espionage in the United States because all responsible United States citizens were opposed to it). That dicta has been roundly criticized by lower courts and commentators alike. See, e.g., Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1083 n. 8 (3d Cir.) (rejecting "the notion that merely because most people would agree that drug trafficking is undesirable, there is no 'controversy' regarding the matter"), cert. denied, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); Smolla, supra, Sec. 2.16, at 2-47 (referring to the Wolston footnote as "a loose and ill-considered bit of dicta"); Carl Willner, Note, Defining a Public Controversy in the Constitutional Law of Defamation, 69 Va.L.Rev. 931, 942 n. 66 (1983) (labeling the footnote a "bizarre bit of illogic")
 
 
 [13]
 In Foretich v. Advance Magazine Publishers, Inc., discussed supra at Part IV-B, the district court applied a different test, previously enunciated by the D.C. Circuit, and held that Doris Foretich was a limited-purpose public figure. See 765 F.Supp. at 1107-08. On appeal here, ABC has not claimed that the decision in Foretich v. Advance Magazine Publishers, Inc. has any collateral estoppel effect with regard to the Fitzgerald /Reuber requirements that we find dispositive
 
 
 [14]
 In addition to accusing them explicitly of molesting their granddaughter Hilary, the complaint implicitly accused them of raising a son, Dr. Foretich, who was also a child molester
 
 
 [15]
 See Restatement (Second) of Torts Sec. 571(a) (1977) (words imputing "a criminal offense" that, "if committed in the place of publication, would be ... punishable by imprisonment in a state or federal institution" are defamatory per se ); see also id. Sec. 574 (words imputing "serious sexual misconduct" are defamatory per se ). When defamation is actionable per se, the plaintiff need not prove "special harm" (i.e., actual economic or pecuniary loss). See id. Secs. 571, 574
 
 
 [16]
 Cf. Restatement (Second) of Torts Sec. 571 cmt. e (1977) (explaining that the crime charged must be a crime where the words are published)
 
 
 [17]
 In so holding, we follow the Gertz Court's advice to formulate "broad rules of general application" that accommodate the competing interests of press and personal reputation, rather than to assess each defamation plaintiff on a purely ad hoc, case-by-case basis, which "would lead to unpredictable results and uncertain expectations." 418 U.S. at 343-44, 94 S.Ct. at 3009; see also Waldbaum, 627 F.2d at 1293 (explaining why clear rules for applying New York Times, Gertz, and their progeny ultimately will benefit both the press and the public by making the constitutional law of defamation more predictable)
 
 
 [18]
 We believe that the acts of which Vincent and Doris Foretich were accused would be punishable by imprisonment in any jurisdiction where ABC's docudrama was broadcast. They certainly are punishable in Virginia, where the harm to the Foretiches' personal reputations was probably greatest. See Va.Code Ann. Secs. 18.2-61 to -67.10 (Michie 1988 & Supp.1994) (criminal sexual assault statutes)
 
 
 [19]
 See W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prosser and Keeton on the Law of Torts Sec. 115, at 825 (5th ed. 1984) (The defendant "may publish, in an appropriate manner, anything which reasonably appears to be necessary to defend his own reputation against the defamation of another ....") [hereinafter Prosser and Keeton on the Law of Torts ]; Laurence H. Eldredge, The Law of Defamation Sec. 85b, at 455 (1978) ("A person whose own good name has been attacked is entitled to answer such attack in his own defense with defamatory charges against his attacker which relate to and answer the plaintiff's charges."); J.A. Bryant, Annotation, Libel and Slander: Qualified Privilege of Reply to Defamatory Publication, 41 A.L.R.3d 1083 (1972) ("[I]t is clearly the general rule that statements made in reply to a defamatory publication enjoy a qualified privilege.") [hereinafter Annotation]; Smolla, supra, Sec. 8.08, at 8-22 ("There is a conditional common law privilege to make statements ... to defend one's reputation in response to attack by another...."); Restatement (Second) of Torts Sec. 594 cmt. k (1977) ("Defense against defamation") ("A conditional privilege exists ... when the person making the publication reasonably believes that his interest in his own reputation has been unlawfully invaded by another person and that the defamatory matter that he publishes about the other is reasonably necessary to defend himself.")
 State courts in every jurisdiction within our Circuit have long recognized the privilege of reply. See, e.g., Haycox v. Dunn, 200 Va. 212, 104 S.E.2d 800, 810-13 (1958); Cartwright v. Herald Publishing Co., 220 S.C. 492, 68 S.E.2d 415, 417 (1951) (per curiam); Duncan v. Record Publishing Co., 131 S.C. 485, 127 S.E. 606, 607 (1925), aff'd on reh'g, 145 S.C. 196, 143 S.E. 31, 55-57 (1927); Alderson v. Kahle, 73 W.Va. 690, 80 S.E. 1109, 1110 (1914); Shepherd v. Baer, 96 Md. 152, 53 A. 790, 791-92 (1902); Gattis v. Kilgo, 128 N.C. 402, 38 S.E. 931, 932-38 (1901); Chaffin v. Lynch, 1 S.E. at 809-13; cf. White v. Nicholls, 44 U.S. (3 How.) 266, 286, 11 L.Ed. 591 (1845) (holding that communications are privileged if the publisher of the alleged slander acted in the prosecution of his own rights or interests).
 
 
 [20]
 At the present stage of the litigation, the Foretiches need not prove that they were acting truthfully, or even in good faith, when they denied that they had abused Hilary. Cf. Street v. National Broadcasting Co., 645 F.2d 1227, 1234 (6th Cir.) ("[L]egal standards in libel cases should not be drawn so that either the courts or the press must first determine the issue of truth before they can determine whether an individual should be treated as a public or a private figure."), cert. dismissed, 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981)
 On remand, the Foretiches will be able to recover damages only if they can prove that they never abused Hilary. See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 768-69, 775-76, 106 S.Ct. 1558, 1558, 1563, 89 L.Ed.2d 783 (1986) (holding that, where a media defendant publishes speech of public concern, a private-figure plaintiff cannot recover damages without proving that the statements at issue were false); see also Gazette, Inc. v. Harris, 229 Va. at 15, 325 S.E.2d at 725 ("[T]he plaintiff must prove falsity...."). Thus, our decision today provides no safe haven for actual sex abusers who deny true accusations against them.
 
 
 [21]
 Reynolds v. Pegler, 223 F.2d 429, 434 (2d Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955)
 
 
 [22]
 Brewer v. Chase, 121 Mich. 526, 533, 80 N.W. 575, 577 (1899)
 
 
 [23]
 See R.H. Bouligny, Inc. v. United Steelworkers of America, 270 N.C. 160, 172, 154 S.E.2d 344, 355 (1967)
 
 
 [24]
 See National Disabled Soldiers' League, Inc. v. Haan, 4 F.2d 436, 442 (D.C.Cir.1925); Fram v. Yellow Cab Co., 380 F.Supp. 1314, 1328-30 (W.D.Pa.1974)
 
 
 [25]
 See Reynolds v. Pegler, 223 F.2d at 433; Shepherd v. Baer, 53 A. at 791-92; Conroy v. Fall River Herald News Co., 306 Mass. 488, 490, 28 N.E.2d 729, 730 (1940); Shenkman v. O'Malley, 2 A.D.2d 567, 574, 157 N.Y.S.2d 290, 297 (1956); Collier v. Postum Cereal Co., 150 A.D. 169, 178, 134 N.Y.S. 847, 853 (1912); Mencher v. Chesley, 193 Misc. 829, 831, 85 N.Y.S.2d 431, 434 (1948)
 
 
 [26]
 Collier v. Postum Cereal Co., 150 A.D. at 178, 134 N.Y.S. at 853; accord Shenkman v. O'Malley, 2 A.D.2d at 574, 157 N.Y.S.2d at 297; Mencher v. Chesley, 193 Misc. at 831, 85 N.Y.S.2d at 434
 
 
 [27]
 See Reynolds v. Pegler, 223 F.2d at 433; Cartwright v. Herald Publishing Co., 220 S.C. 492, 68 S.E.2d 415, 417 (1951) (per curiam)
 
 
 [28]
 See Afro-American Publishing Co. v. Jaffe, 366 F.2d 649, 656 (D.C.Cir.1966) (en banc)
 
 
 [29]
 Shenkman v. O'Malley, 2 A.D.2d at 574, 157 N.Y.S.2d at 297-98
 
 
 [30]
 Dickins v. International Bhd. of Teamsters, 171 F.2d 21, 25 (D.C.Cir.1948)
 
 
 [31]
 Mosrie v. Trussell, 467 A.2d 475, 478 (D.C.1983)
 
 
 [32]
 Id. at 479 (citation and internal quotation marks omitted); accord Collier v. Postum Cereal Co., 150 A.D. at 178, 134 N.Y.S. at 853
 
 
 [33]
 Cartwright, 68 S.E.2d at 417 (citation and internal quotation marks omitted)
 
 
 [34]
 Goforth v. Avemco Life Ins. Co., 368 F.2d 25, 32 (4th Cir.1966)
 
 
 [35]
 Chaffin v. Lynch, 1 S.E. at 813
 
 
 [36]
 Mosrie v. Trussell, 467 A.2d at 479 (citation and internal quotation marks omitted); accord Collier v. Postum Cereal Co., 150 A.D. at 178, 134 N.Y.S. at 853
 
 
 [37]
 Reynolds, Comment, supra, at 98; see also id. at 98 n. 26 (quoting Adam v. Ward, [1917] A.C. 309, 324 ("The ambit of the contradiction should be spread so wide, as, if possible, to meet the false accusation wherever it went. Do what you will, the stern chase after a lie that has got the start is apt to be a long one."))
 
 
 [38]
 See Barr v. Matteo, 256 F.2d 890, 891 (D.C.Cir.1958) (per curiam), rev'd on other grounds, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Mencher v. Chesley, 193 Misc. at 831, 85 N.Y.S.2d at 434; see also Richmond v. Southwire Co., 980 F.2d 518, 520 (8th Cir.1992) (per curiam); Dickins v. International Bhd. of Teamsters, 171 F.2d at 25
 
 
 [39]
 See Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 n. 6, 110 S.Ct. 2695, 2706 n. 6, 111 L.Ed.2d 1 (1990) (reserving the question of whether the distinction between media and nonmedia defendants has any constitutional significance, but implying that the actual malice requirement for public figures applies in all defamation cases, without regard to the media or nonmedia status of the defendant); see also Restatement (Second) of Torts Sec. 580B cmt. e (1977) (suggesting that Gertz applies to media and nonmedia defendants alike); id. Sec. 621 cmt. b (same); cf. Hepps, 475 U.S. at 780, 106 S.Ct. at 1565 (Brennan, J., concurring) (arguing that a media/nonmedia distinction is irreconcilable with the fundamental First Amendment principle that the inherent worth of speech does not depend upon the identity of its source)